UNISPLAY, S.A., Plaintiff–Appellee,

v.

**AMERICAN ELECTRONIC SIGN CO., INC., Defendant,**

and

**Luke G. Williams, Defendant–Appellant.**

No. 95–1085.

United States Court of Appeals, Federal Circuit.

Oct. 25, 1995.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Dec. 28, 1995.

---

F. Ross Boundy, Christensen, O'Connor, Johnson & Kindness, Seattle, Washington, argued, for plaintiff-appellee. With him on the brief was Stacy Quan.

Paul T. Meiklejohn, Seed and Berry, Seattle, Washington, argued, for defendant-appellant. With him on the brief were Ramsey M. Al–Salam and Clarence T. Tegreene. Also on the brief was Lawrence R. Small, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Washington.

Before LOURIE, CLEVENGER, and SCHALL, Circuit Judges.

LOURIE, Circuit Judge.

Luke G. Williams appeals from the orders and final judgments of the United States District Court for the Eastern District of Washington concluding that Unisplay S.A.'s U.S. Patent 4,163,332 (the '332 patent) is not invalid; that Williams infringed claims 9, 10, and 13 of the '332 patent; and that Williams is liable for damages, increased damages, and attorney fees. *Unisplay S.A. v. American Elec. Sign Co.*, No. CS–92–214–JLQ (E.D.Wash. Sept. 7, 1993) (order granting summary judgment that the '332 patent is not invalid); *Unisplay S.A. v. American*

*Elec. Sign Co.,* No. CS–92–214–JLQ (E.D.Wash. April 6, 1994) (order granting summary judgment that laches does not preclude a finding of infringement); *Unisplay S.A. v. American Elec. Sign Co.,* No. CS–92–214–JLQ (E.D.Wash. Nov. 7, 1994) (decision denying motion for judgment as a matter of law or for a new trial on the issue of damages and awarding Unisplay enhanced damages, attorney fees, and prejudgment interest). We affirm the decision of the court in its entirety except for its determination that Williams is not entitled to a new trial on damages. Because the award of actual damages is excessive and unsupported by relevant evidence, we vacate the award and remand for a new trial unless Unisplay consents to remit a portion of the judgment as calculated by the district court on remand.

## BACKGROUND

Unisplay develops and licenses technology related to the manufacture and sale of electronic signs. Dr. Paddy Salam is the majority owner of Unisplay. Salam developed a sign (the Solar Glo sign) in which flaps, arranged in a matrix, open and close to display messages. When a flap is opened, a window is exposed and light is emitted from behind the window ("backlit") and reflected from the underside of the flap. When a flap is closed, no light is transmitted or reflected. By combining reflective flaps with the backlit technology, Salam's invention provides good visibility of display messages both in daylight, by reflecting light, and after dark, by transmitting light. Salam applied for a patent, which issued as the '332 patent on August 7, 1979.

Luke G. Williams has been involved in the electronic sign business since the mid–1970's, when he was part owner and manager of American Sign & Indicator Company (AS & I). In 1983, Williams sold his interest in AS & I to Brae Corporation. As part of the sales agreement, Williams signed a five-year covenant not to compete with AS & I or Brae. Despite this covenant, Salam and Williams negotiated an agreement in 1986 in which Unisplay agreed to pay Williams 10%

of all proceeds from any license agreement involving the Solar Glo sign technology [1] that Unisplay entered into with Williams' assistance. Williams did not obtain any such licenses.

During this time and until August 1988, Williams himself attempted to enter into an exclusive license with Unisplay for the Solar Glo sign technology. All of the negotiations between Williams and Unisplay contemplated royalty rates between 3% and 7.5%, with an up-front licensing fee of about $200,000. Williams' final offer on August 12, 1988 proposed an exclusive license with an up-front payment of $200,000; minimum quarterly payments; and a royalty rate of 5% on the first $20 million in sales, 4% on the next $20 million in sales, and 3% on all subsequent sales. On August 22, 1988, Unisplay countered with a requirement for an up-front payment of $200,000 and a royalty of 5% on the first $20 million of sales, but higher minimum quarterly payments, a royalty of 4.5% on the second $20 million of sales, and a royalty of 4% on all subsequent sales. Williams and Unisplay never reached agreement.

Even during these negotiations, however, Williams showed signs of developing his own signs. On April 5, 1988, five days after the expiration of his non-compete agreement with Brae, Williams incorporated American Electric Sign Co., Inc. (AESCO) and began developing signs that competed with Unisplay's Solar Glo sign. From 1989 to 1992, AESCO's annual sales grew to almost $3 million.

In February 1991, Unisplay's attorney sent AESCO a letter expressing concern that Williams might be infringing the '332 patent and once again offering a license. AESCO did not respond. Ten months later, Unisplay sent a similar letter. Again, AESCO did not respond. Additional discussion followed, but the parties could not reach agreement. Unisplay then filed suit in the United States District Court for the Eastern District of Washington, asserting claims for patent infringement, trademark infringement, unfair

---

1. In addition to the '332 patent, a license for the Solar Glo sign technology as offered by Unisplay included four other patents, know how, and provision of technical assistance.

competition, misappropriation of trade secrets, breach of contract, and breach of confidential relationship. Williams and AESCO asserted the defenses of laches and estoppel, referring to the delay in Unisplay's filing suit, and counterclaimed for a declaratory judgment of patent invalidity and noninfringement.

On May 26, 1993, the district court granted summary judgment to Williams and AESCO on all of the non-patent issues. *Unisplay S.A. v. American Elec. Sign Co.,* No. CS–92–214–JLQ (E.D.Wash. May 26, 1993). In response to a second summary judgment motion, the court granted summary judgment in favor of Unisplay that claims 9, 10, and 13 of the '332 patent were not invalid. *Unisplay S.A. v. American Elec. Sign Co.,* No. CS–92–214–JLQ (E.D.Wash. Sept. 7, 1993). In its latter decision, the court held that a sign made by Guenther Selig in 1975 did not constitute anticipatory prior art to the '332 patent because Selig's sign did not use external reflective lighting.[2] *Id.,* slip op. at 26. Moreover, the court held that the invention of the asserted claims was not obvious in view of the combination of Selig's sign and U.S. Patent 1,191,023 issued to Naylor (the '023 patent). *Id.,* slip op. at 31–32.[3] In response to a third motion for summary judgment, the court held that Unisplay's delay in bringing suit was not unreasonable and therefore granted summary judgment in favor of Unisplay on Williams' and AESCO's defense of laches. *Unisplay S.A. v. American Elec. Sign Co.,* No. CS–92–214–JLQ, slip op. at 14 (E.D.Wash. April 6, 1994).

The court then held a bifurcated trial in which the issues of infringement and damages were tried separately to the same jury. The jury returned a verdict finding that AESCO and Williams infringed claims 9, 10, and 13 of the '332 patent.

Before the trial on damages, Unisplay informed the court that it would not seek lost profits as the measure of damages. Instead, Unisplay argued that it was entitled to a reasonable royalty based on projected sales for its Solar Glo sign, not AESCO's actual sales. In support, Unisplay sought to introduce evidence of 1986 and 1987 sales projections that Williams obtained while he was associated with Unisplay.[4] These projections greatly exceeded AESCO's actual sales of $11.5 million. Unisplay argued that it was entitled to a reasonable royalty on projected sales rather than actual sales because AESCO had "poisoned the market" for the Solar Glo sign. Under its theory, Unisplay argued that AESCO's sales of its alleged infringing sign would have met the projections for the Solar Glo sign had AESCO not sold defective signs. Therefore, Unisplay asserts that it should not have to bear the burden of AESCO's shortcomings by having its recovery of damages limited to a reasonable royalty on AESCO's actual sales.

Williams and AESCO filed a motion in limine to exclude these sales projections. The court granted the motion, specifically rejecting Unisplay's "poison the market" theory. Thus, the court required Unisplay to prove damages based on a reasonable royalty on actual sales.

During the trial on damages, Unisplay called its damage expert, Gary Burns, to testify. Despite the court's ruling on the "poison the market" theory, Burns testified, over objection, that Unisplay's damages should be calculated based on a royalty on projected sales of "five percent for the first 20 million in sales, four percent for the next 20 million, and for all sales over $40 million, at three percent." Based on the projected sales data and these royalty rates, Burns opined that Unisplay was entitled to $9.5 million in damages.

**2.** Selig applied for a patent on this sign in 1977 and the application issued as U.S. Patent 4,215,338 (the '338 patent) on July 29, 1980.

**3.** On July 7, 1995, the U.S. Patent and Trademark Office issued "A Notice of Intent to Issue a Reexamination Certificate," in which the examiner confirmed the patentability of the '332 claims in view of Naylor's '023 patent, Selig's '338 patent, and other prior art.

**4.** Williams hired Raymond T. Anderson to provide an analysis of the market potential of the Solar Glo technology. In an initial letter on July 2, 1986, Anderson estimated that the potential market for the product was "100 to 200 million or more."

AESCO and Williams called their own expert, Gordon Budke, who testified that a reasonable royalty would be 1% of actual sales. Although negotiations between Unisplay and AESCO had focused upon royalty rates between 3% and 7.5%, Budke reasoned that 1% was appropriate for the three claims of the '332 patent because the prior negotiations were for the entire Solar Glo sign technology, which involved more than just the claims of the '332 patent. On cross examination of Budke, Unisplay introduced an exhibit, Exhibit 144, which applied various royalty rates, minimum quarterly payments, and an up-front licensing fee to AESCO's actual sales of $11.5 million. The exhibit allegedly showed calculations of reasonable royalty damages based on Unisplay's final written offer to AESCO and Williams on August 29, 1988. Each calculation assumed an up-front licensing fee of $200,000 and minimum quarterly payments. The results of the calculations shown in Exhibit 144 are summarized below:

| Total Sales (millions) | Licensing Fee | Royalty Rate | Royalty Payable | Total Payable |
|---|---|---|---|---|
| $11.5 | $200,000 | 5% | $998,125 | $1,198,125 |
| $11.5 | $200,000 | 6.5% | $1,089,817 | $1,289,817 |
| $11.5 | $200,000 | 7.5% | $1,186,712 | $1,386,712 |
| $11.5 | $200,000 | 10% | $1,428,950 | $1,628,950 |

After the parties' closing arguments, the judge instructed the jury to calculate damages based on a hypothetical negotiation over a reasonable royalty. He stated that "[a] reasonable royalty is the amount of money a willing patent owner and willing, prospective licensee would have agreed upon at the time of the infringement for license to make the invention." As to the "poison the market" theory, the judge further instructed the jury:

In determining a reasonable royalty, you may base damages on sales that have actually taken place. You may not award damages on speculation. You may have heard the phrase "poisoning of the market" used in connection with this case. That theory is not the proper measure of the plaintiff's damages.

The measure of the plaintiff's damages is the reasonable royalty. The amount you determine as a reasonable royalty must be reasonable under all the circumstances, that is, it must be at least a close approximation of what would be adequate to compensate for the use made of the invention by the defendant.

The jury returned a verdict of $1,628,950,[5] indicating through special verdicts that the damages were based on actual sales, not the "poison the market" theory. Pursuant to this verdict, the court entered judgment against AESCO and Williams, assessing two-thirds of the damages against Williams, individually, and one-third against AESCO. Following post-trial motions, the court increased damages by 25% based on a finding of willfulness, awarded prejudgment interest on the actual damages, and granted Unisplay's motion for attorney fees.

AESCO and Williams filed a motion for judgment as a matter of law and a motion to amend the judgment and/or for a new trial on damages. The court denied both motions. *Unisplay S.A. v. American Elec. Sign Co.,* No. CS–92–214–JLQ (E.D.Wash. Nov. 7, 1994). With respect to damages, the court held that the amount of the verdict was within the range of reasonableness. The court found that the following evidence supported the verdict: testimony by Salam that a prior agreement in 1975 between AS & I and Unisplay involving similar technology provided for a 10% royalty; a June 14, 1986 letter in which Unisplay had offered Williams a 10% commission on any license for the Solar Glo sign technology that Williams negotiated for Unisplay; and, finally, the expert testimony by Burns, Unisplay's damages

5. The jury verdict of $1,628,950 represents approximately 14% of AESCO's actual sales. This amount is also identical to the amount displayed in Exhibit 144, in which Unisplay calculated the amount of damages based on a $200,000 up-front licensing fee, minimum quarterly payments, and a 10% royalty rate.

expert, in which he said that a party familiar with all the circumstances at the time of the trial would have been willing to pay a 10%–12% royalty. Williams now appeals.[6]

## DISCUSSION

On appeal, Williams argues a plethora of issues, what some might call a shotgun approach. Williams' "Statement of the Issues" raises over fifteen arguments in which Williams challenges the jury's findings and the district court's determinations regarding validity, infringement, damages, willfulness, laches, and estoppel. Despite their number, we have considered each argument carefully under our appropriate standard of review and affirm the decision in its entirety except for the court's determination of damages based on a reasonable royalty.

### 1. *Reasonable Royalty*

■ When infringement has been shown, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284 (1988). The statute contemplates that when a patentee is unable to prove entitlement to lost profits or an established royalty rate, it is entitled to "reasonable royalty" damages based upon a hypothetical negotiation between the patentee and the infringer when the infringement began. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078, 219 USPQ 679, 682 (Fed.Cir.1983) (describing the hypothetical negotiation as one "resulting from

arm's length negotiations between a willing licensor and a willing licensee"). Although this analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty. Any rate determined by the trier of fact must be supported by relevant evidence in the record.[7] Of course, the court may also award increased damages, attorney fees, and prejudgment interest when appropriate. *See* 35 U.S.C. §§ 284–85 (1988).

■ The determination of the amount of damages based on a reasonable royalty is an issue of fact.[8] *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1924 (Fed.Cir.1991). When a party files a motion to amend the judgment or in the alternative to grant a new trial on the amount of damages awarded by a jury, "the trial court determines whether the jury's verdict is against the clear or great weight of the evidence." *See Standard Havens Prods. v. Gencor Indus.*, 953 F.2d 1360, 1367, 21 USPQ2d 1321, 1326 (Fed.Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992). The district court has wide discretion in determining whether to grant a new trial under this standard. Therefore, our role on appeal is to decide whether the district court's decision constituted an abuse of discretion. *See id.* at 1367, 21 USPQ2d at 1326; *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1581, 1 USPQ2d 1081, 1092 (Fed.Cir.1986).

■ On appeal, Williams argues that the jury's reasonable royalty determination,

---

6. Initially, both AESCO and Williams appealed the district court's decision. Prior to oral argument, Unisplay notified the court that a complete settlement had been reached between AESCO and Unisplay. In an August 8, 1995 order, we accordingly dismissed AESCO's appeal.

7. A comprehensive list of relevant factors in determining a reasonable royalty is set out in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120, 166 USPQ 235, 238 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).

8. In *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1543, 35 USPQ2d 1065, 1067 (Fed.Cir.1995) (in banc), this court stated:

> In order to prevail on appeal on an issue of damages, an appellant must convince us that the determination was based on an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion.

This language, however, was only intended to be comprehensive and was not intended to overrule the distinction in *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1924 (Fed.Cir.1991), between the clearly erroneous review of the amount of damages and abuse of discretion review of methodology.

whether it represented a 14% royalty or a 10% royalty with an up-front licensing fee of $200,000, was not supported by relevant evidence. Moreover, Williams asserts that the court erred by allowing Unisplay to present its "poison the market" theory despite the court's prior decision granting Williams' motion in limine disqualifying that theory. Williams further argues that the court erred in allowing Unisplay to introduce Exhibit 144 during cross-examination of Budke, Williams' damages expert, because there was no testimony or evidence that the royalty rates in the exhibit reflected what the parties might have agreed to during a hypothetical negotiation at the time infringement began.

Unisplay counters that the evidence supports the jury's verdict. In particular, Unisplay relies on testimony by its damages expert, Burns, who testified that the royalty rate could have been "as high as 10% or 12%." Unisplay also points to a proposed license agreement that Williams, while acting as Unisplay's agent, attempted to negotiate with potential licensees of the Solar Glo sign technology. That proposal suggested either a 10% royalty without an up-front licensing fee or a 7.5% royalty with a $350,000 up-front payment.

■ We accept Williams' argument that the royalty determination was not supported by *relevant* evidence. The relevant evidence of record does not support a verdict of $1,628,950, whether the jury calculated the damages based on a 14% royalty or a 10% royalty with minimum quarterly payments plus a $200,000 up-front payment. A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment. *See Hanson,* 718 F.2d at 1079, 219 USPQ at 682 ("The key element in setting a reasonable royalty ... is the necessity for return to the date when the infringement began.") (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1158, 197 USPQ 726, 731 (6th Cir. 1978)).

The testimony of Unisplay's expert, Mr. Burns, that a royalty "probably could go as high as 10 or 12 percent" does not meet this test because it was not directed to the time of infringement. Burns' testimony on this point, given at the very end of his other testimony supporting the "poison the market" theory, stated:

Q: Based on what you have seen from the parties, what would you believe that a reasonable royalty would be on a *go forward basis from here on out?*

A: I would expect that a royalty *given the situation with [sic] the company's in now,* probably between [6.5] and 8 percent.... [A royalty of 7.5 percent] was discussed quite a bit, with the number this high, so it probably could go as high as 10 or 12 percent *with the revenues as they are.*

Clearly, Burns was not discussing what royalty rate a hypothetical negotiation would have yielded *at the time the infringement began.* Instead, Burns was testifying to what the parties might arrive at *at the time of the trial.* Such testimony was not directed to the proper reasonable royalty criterion and therefore cannot support the jury's verdict.

Moreover, Burns' testimony focused on a royalty rate applied to projected sales under the "poison the market" theory. At no time did he testify that a hypothetical negotiation between the parties at the time the infringement began would have yielded such an agreement. Therefore, his testimony based on the excluded "poison the market" theory was irrelevant and cannot support the jury's verdict.[9]

Although the jury rendered a verdict identical to a damage calculation displayed in Exhibit 144, this calculation also cannot support the jury's verdict. Unisplay introduced the exhibit to illustrate the calculation of damages based on various royalty rates applied to AESCO's actual sales, but Unisplay did not provide any evidence or testimony to show that that calculation in the exhibit reflected *what the parties might have agreed*

---

9. Unisplay's presentation of its "poison the market" theory in itself did not "poison the case." The trial court properly instructed the jury to base its verdict on actual sales, not projected sales.

*to,* at any time, particularly at the time the infringement began.

Unisplay further attempts to support the jury's verdict with evidence of license terms proposed between Williams and Unisplay, as well as between Unisplay and third parties. These license proposals suggested, at most, a 10% royalty on sales of the Solar Glo sign with minimum quarterly payments. In addition, Unisplay relies on evidence of a prior license agreement between AS & I and Salam. This license agreement provided for a 10% royalty on sales of a similar sign. We agree that this evidence should carry considerable weight in calculating a reasonable royalty rate. *See Georgia–Pacific,* 318 F.Supp. at 1120, 166 USPQ at 238. However, none of these license proposals or agreements involved an amount as large as that awarded by the jury.

■ The evidence does not support a damage award based on a royalty of more than 10% with minimum quarterly payments. The district court thus abused its discretion by failing to grant Williams' motion for a new trial. In rendering our decision, we do not hold that a jury may only arrive at a royalty specifically articulated by the parties during trial. *See SmithKline,* 926 F.2d at 1168, 17 USPQ2d at 1928 ("A court is not restricted in finding a reasonable royalty to a specific figure put forth by one of the parties."). Rather, a jury's choice simply must be within the range encompassed by the record as a whole. Here, it was not within that range.

### 2. *Remittitur*

■ Although the district court erred in determining that the jury's verdict was not excessive, a new trial may not be necessary in this case. Unisplay may avoid a new trial by agreeing to a remittitur of the excessive portion of the damage award. *See Aguinaga v. United Food & Commercial Workers Int'l Union,* 58 F.3d 513 (10th Cir.1995) (ordering remittitur because district court erred in calculation of setoff to damages); *American Road Equip. Co. v. Extrusions, Inc.,* 29 F.3d 341 (8th Cir.1994) (ordering remittitur because jury awarded damages in excess of amount proved). In doing so, we are mindful that a court is not at liberty to simply substi-

tute its own judgment as to the amount of damages for the findings of a jury. However, the use of remittitur enables parties to avoid the delay and expense of a new trial when a jury's verdict is excessive in relation to the evidence of record. *See* 11 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2815 (2nd ed. 1995).

When calculating an amount to remit, in order to encourage use of the efficient remittitur option, we will follow the "maximum recovery rule," which requires that the determination be based on the highest amount of damages that the jury could properly have awarded based on the relevant evidence. *See, e.g., Earl v. Bouchard Transp. Co.,* 917 F.2d 1320, 1328–30 (2nd Cir.1990) (following the maximum recovery rule); *Marchant v. Dayton Tire & Rubber Co.,* 836 F.2d 695, 704 (1st Cir.1988) (same). Here, much of the evidence presented during the trial focused on negotiations between the parties for a royalty of between 3% and 7.5%, with an up-front license fee. However, the record also includes evidence consisting of prior agreements between the parties and other proposed agreements with third parties that supports a 10% royalty with minimum quarterly payments, but without an up-front licensing fee. Application of the maximum recovery rule thus provides for an award of a 10% royalty with minimum quarterly payments, but without an up-front licensing fee. As shown in Exhibit 144, a 10% royalty with associated minimum quarterly payments, without an up-front licensing fee, results in a damage calculation of $1,428,950.

We are unable to determine the exact amount to remit because the record is not complete as to the prejudgment interest calculations. Therefore, we vacate and remand to the district court to calculate the amount to remit based on actual damages of $1,428,-950 and the court's prior discretionary determinations, which we do not disturb, as to enhancement of damages by 25%, attorney fees, and prejudgment interest. Should Unisplay refuse to accept the reduction of the award, it will be entitled to a new trial on damages.

## CONCLUSION

We affirm the decision of the district court as to all issues except damages. We hold that the court erred in denying Williams' motion to amend the judgment on the amount of damages and/or motion for a new trial on damages. Accordingly, we vacate and remand. On remand, the district court should order a new trial on Unisplay's claim for damages unless Unisplay agrees to remit the excess portion of the award as calculated by the district court.

## COSTS

The parties shall bear their respective costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED.*