106 F.3d 427
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
TOTAL CONTAINMENT, INC., Plaintiff-Appellant,
v.
ENVIRON PRODUCTS, INC., Defendant, Cross-Appellant,
and
Michael C. Webb, Defendant.
 Nos. 96-1138, 96-1151.
 United States Court of Appeals, Federal Circuit.
 Jan. 17, 1997.
 
 Before MICHEL, PLAGER, and BRYSON, Circuit Judges.
 DECISION
 BRYSON, Circuit Judge.
 
 
 1
 Total Containment, Inc. (TCI) appeals, and Environ Products, Inc. (EPI) cross-appeals, from the judgment of the United States District Court for the Eastern District of Pennsylvania following a bench trial in TCI's patent infringement suit against EPI. Total Containment, Inc. v. Environ Prods., Inc., 921 F.Supp. 1355 (E.D.Pa.1995). We affirm-in-part, vacate-in-part, and remand.
 
 BACKGROUND
 
 2
 TCI owns U.S. Patent Nos. 5,040,408 (the '408 patent) and 5,060,509 (the '509 patent). The two patents originated from a common application, which was directed to secondary containment systems for preventing leakage from underground storage systems, such as those found in gasoline service stations. Secondary containment systems of this type usually include a tank sump consisting of two main elements--an underground sump base that surrounds the dispensing pump and collects leakage from the pump and fittings, and a riser that provides access to the interior of the sump from ground level. Both TCI and EPI manufacture secondary containment systems.
 
 
 3
 TCI filed suit against EPI, alleging that EPI's tank sump infringed various claims of the '408 and '509 patents. While the action was pending, EPI filed several requests for reexamination of the patents-in-suit with the Patent and Trademark Office, citing prior art references that were not before the examiner during the original prosecution of those patents. The PTO allowed various claims of the patents, either as amended or in their original form.
 
 
 4
 Following a trial on the merits, the district court found that one of EPI's products infringed claim 5 of the '408 patent, but that none of its other products infringed any of the asserted claims. On the issue of damages, the court denied TCI's request for lost profits, because the court found that TCI had failed to prove the absence of acceptable noninfringing substitutes. The court therefore determined that damages should be set according to what would have been a reasonable royalty for the use made of the invention. Using the reasonable royalty test, the court awarded TCI a royalty equal to 21 percent of EPI's sales of the infringing products. In addition, applying 35 U.S.C. § 285, the court found the case to be exceptional in one respect and awarded TCI attorneys' fees for its defense against EPI's charge of inequitable conduct. This appeal and cross-appeal followed.
 
 DISCUSSION
 
 5
 On appeal, TCI alleges that the district court made a series of errors in claim construction that resulted in the court's improper rejection of most of TCI's infringement arguments. EPI argues on cross-appeal that the district court improperly awarded TCI partial attorneys' fees and that the court unjustifiably adopted a 21 percent royalty as the basis for awarding damages to TCI with respect to the one EPI product that was found to be infringing.
 
 TCI's Appeal
 
 6
 1. Cover "having means for accessing the interior" of the sump
 
 
 7
 TCI argues that the district court erred in construing the phrase "a cover mounted over said riser and having means for accessing the interior of said riser section and said hollow sump base," which appears in claim 7 of the '509 patent. The court construed that claim language as requiring that the riser section of the claimed device have both a cover and a separate means for gaining access to the inside of the sump, such as an opening in the cover. TCI contends that the disputed claim limitation is satisfied as long as the cover permits access to the inside of the sump; under TCI's construction, a cover satisfies the "having means for accessing" element as long as the cover is removable.
 
 
 8
 The language of claim 7 is inconsistent with the construction that TCI advocates. As the district court pointed out, the claim does not recite a cover "providing access" to the inside of the sump, but characterizes the cover as "having means" for such access. In this context, the expression "having means" denotes a separate structural feature, such as an access lid built into the cover. A riser cover that is removable may be said to provide, permit, or allow access to the inside of the sump, but a cover that is merely removable would not be described as one "having means" for such access.
 
 
 9
 TCI argues that the doctrine of claim differentiation supports its construction of the disputed clause because claim 15 of the '509 patent, which was added during reexamination, explicitly recites "an access lid mounted on said cover." TCI cannot, however, invoke the doctrine of claim differentiation by relying on a claim added during reexamination to interpret language in one of the original claims in a way that would broaden the reach of that claim. To permit the use of claims added during reexamination for that purpose would invite manipulation of the reexamination process and would not be a reliable guide to the meaning of language used in the original claims.
 
 
 10
 Like the district court, we reject TCI's contention that a removable cover is an equivalent structure to the access lids disclosed in the specification of the '509 patent. Of course, a removable cover that has an access lid is, in a sense, interchangeable with a removable cover that lacks an access lid, in that either design permits access to and observation of the inside of the sump. But the cover with an access lid is capable of the additional function of permitting such access without the need to remove the cover altogether, a function that obviously cannot be performed by a removable cover that lacks an access lid. We therefore agree with the district court that claim 7 of the original '509 patent does not read on the EPI products that lack an access lid on the cover.
 
 
 11
 We also agree with the district court that claim 11 of the '509 patent, which was added on reexamination, does not read on the EPI products that have no separate access means in the cover. Claim 11 contains the same language as each of the original '509 patent claims with respect to the means for accessing the interior of the sump, and that language may not be given broader scope in the claims added on reexamination than it had in the claims of the original patent. To do so, as the district court observed, would be contrary to the reexamination statute, 35 U.S.C. § 305, which prohibits broadening claims on reexamination.
 
 
 12
 2. "Surrounding relationship"
 
 
 13
 TCI argues that the district court erred in concluding that claim 9 of the '408 patent was not infringed by the Environ 2, a secondary containment system that EPI sold for a period of several months in 1992. Claim 9 recites in pertinent part a riser extension mounted in "surrounding relationship" to an opening in the upper surface of the sump base. EPI argues that the term "surrounding relationship" requires that there be a coplanar relationship between the riser and the sump base, i.e., that some portion of the riser vertically overlap some portion of the base.
 
 
 14
 EPI's original tank sump product, the Environ 1, had an annular lip that extended up into the riser section so that the lip portion of the base was coplanar with a portion of the riser. After the district court granted TCI a preliminary injunction on the ground that the Environ 1 infringed claim 5 of the '408 patent, EPI modified the Environ 1 by removing the annular lip. In the modified product, the Environ 2, the bottom of the riser rested on the top of the sump base, and no portion of either the riser or the base overlapped any portion of the other. EPI argues that with that modification, the Environ 2 did not infringe the '408 patent.
 
 
 15
 TCI disagrees. In TCI's view, the riser section of the Environ 2 bore a "surrounding relationship" to the opening in the top of the sump base because the riser section encircled the opening in the base, even though no portion of the riser section was coplanar with the opening in the top of the base.
 
 
 16
 Like the district court, we are hard pressed to ascertain the meaning of the term "surrounding relationship" as that term is used in the '408 patent. The term is not used in the specification, and the manner in which it is used in the claims is not particularly enlightening. The specification, however, uses the term "surrounds" in a way that suggests that the surrounding element (an upstanding annular lip) overlaps or shares a plane with the element it surrounds (a central opening in the riser cover). The term "surrounding relationship" is used in that same manner in claim 5 of the '408 patent, in which the surrounding element (an upstanding annular portion on the upper surface of the sump base) shares a plane with the element it surrounds (an opening formed in the upper surface of the base). The term is also used in claims 1 and 3 of the '408 patent, but its use in those two claims is almost incoherent and provides no assistance in the task of claim construction.
 
 
 17
 Invoking the doctrine of claim differentiation, TCI argues that claim 9 of the '408 patent must be read to include structures such as the Environ 2, in which the base and riser do not overlap vertically, because dependent claim 10 recites an overlapping structure, to wit, a "sump base [that] includes an upstanding portion surrounding said opening therein" and a "riser extension [that] fits over said upstanding portion." The fact that claim 10 recites a particular overlapping structure, however, does not mean that claim 9 must be read to include non-overlapping structures. Claim 9 is broader than claim 10 even if claim 9 is construed as limited to overlapping structures. For example, claim 9 would read on a structure in which the top of the sump base was flat but the riser section had an annular lip that extended downward so that it was coplanar with the opening in the top of the base. Claim 10, however, would not read on such a structure. The doctrine of claim differentiation therefore does not help TCI with respect to the "surrounding relationship" element.
 
 
 18
 The ordinary meaning of the term "surround" is to "encircle" or "enclose." In a three-dimensional setting, a surrounding object is normally considered to be co-planar with the surrounded object. Thus, for example, a basketball rim would not ordinarily be said to "surround" the net, and a coaster would not ordinarily be said to "surround" a glass that rests on it. If the word "surround" is accorded this ordinary meaning, the riser extension of the Environ 2 sump tank cannot be said to be "in surrounding relationship" to the central opening in the upper wall of the sump base, as is required by claim 9 of the '408 patent, because the riser sits entirely atop the base and no portion of the riser shares a common plane with the central opening in the top of the base.
 
 
 19
 When patent claims have been drafted in a manner that gives rise to real doubt as to the proper scope of the claims, this court has observed that to give the patentee the benefit of the broader of two possible claim interpretations "would undermine the fair notice function of the requirement that the patentee distinctly claim the subject matter disclosed in the patent." Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581, 37 USPQ2d 1365, 1372 (Fed.Cir.1996). This case is an appropriate one in which to apply that principle. Doing so, we construe the term "surrounding relationship" to require that the surrounding element and the surrounded element share a common plane. Because that relationship did not exist between the riser section and sump base opening in the Environ 2, we affirm the district court's finding that the Environ 2 did not infringe claim 9 of the '408 patent.
 
 
 20
 3. Separate "riser section"
 
 
 21
 TCI next asserts that the district court erred when it construed the phrase "riser section" in claims 7 and 11 of the '509 patent as reciting a riser that is physically separate from the sump base. Because of that mistaken claim construction, TCI argues, the district court erroneously held that claims 7 and 11 do not read on EPI's one-piece base-riser products.
 
 
 22
 In the original prosecution of the '408 patent, TCI touted "nesting" as a "feature of the invention." Nesting, which allows the riser to be packed inside the sump base to facilitate transportation, requires that the base and riser be separate units. Although TCI made the representation regarding nesting during the prosecution of the '408 patent rather than the '509 patent, the representation is pertinent to the '509 patent as well, because the "riser section" limitation appears in both patents and because the two patents originate from a single parent application.
 
 
 23
 TCI contends that the figures that accompany the '509 patent show that claim 7 must be construed to encompass both one-piece and two-piece sump assemblies. In fact, the figures favor the district court's claim construction, not TCI's. The first figure shows the riser section as separate from the base section and is thus consistent with the district court's analysis. The second figure, on which TCI relies, shows the complete sump assembly with the base and riser attached. TCI points out that the cross-hatching on the riser and base in the second figure seem to be oriented in the same direction, which is consistent with the two sections constituting a single unit. The text of the patent, however, undermines TCI's reliance on the cross-hatching, for it describes the first and second figures not as separate embodiments but as simply "the two stages in assembly of a secondary containment system in accordance with a first embodiment of the present invention." Thus, the text makes it quite clear that the second figure does not illustrate a different embodiment from the two-piece base-riser embodiment depicted in the first figure; instead, the second figure simply depicts the two-piece embodiment of the first figure as it appears after the secondary containment system has been installed. Inasmuch as the specification contains no reference to any one-piece sump-riser embodiment and in fact suggests that the patent is directed only to a two-piece embodiment, we agree with the district court that the "riser section" limitation in claims 7 and 11 of the '509 patent is not met by EPI's one-piece tank sump product.
 
 4. Score lines
 
 24
 Claim 7 of the '509 patent recites a riser incorporating "score lines," which are used to aid in cutting the riser so that the sump can be buried at the proper depth in the ground. Claim 11 of the '509 patent is identical to claim 7, except that it recites a plurality of "cutting guides" instead of "score lines." EPI's Environ 2 included a set of corrugations on the riser extension, and EPI concedes that the corrugations were used as cutting guides.
 
 
 25
 The district court found that the riser of the Environ 2 did not have "score lines" and therefore did not literally infringe claim 7. TCI does not contest that finding, but argues that the corrugations on the Environ 2 are equivalent to the "score lines" recited in claim 7 and that the Environ 2 therefore should have been held to infringe under the doctrine of equivalents.
 
 
 26
 In addressing TCI's argument on equivalency, the district court found that the "score lines" of claim 7 and the corrugations found in the riser sections of the Environ 2 are equivalent structures. The court further found, however, that a prior art reference (the Hancor reference) describes the use of corrugations as an aid to cutting a riser to the proper size. The court therefore refused to give "score lines" a range of equivalents that would encompass the structure described in the prior art.
 
 
 27
 The Hancor reference, which was not before the PTO during prosecution, describes an underground tank with inlet/outlet connections, a riser incorporating corrugations to aid in trimming the riser to the proper height, and a removable cover. Although the Hancor reference does not describe secondary containment systems, the district court found that it nevertheless constituted pertinent prior art, and we uphold that factual finding as not clearly erroneous.
 
 
 28
 TCI argues that even if Hancor is accepted as pertinent prior art, the district court nonetheless improperly narrowed its focus to an examination of only a single element when it concluded that Hancor limits the scope of equivalents that can be afforded to claim 7. The riser cover described in the Hancor reference is removable but lacks separate means for accessing the interior of the riser. The riser cover of the Environ 2, by contrast, incorporated access lids. Because of that difference, TCI contends that if claim 7 were given a scope of equivalents sufficient to encompass the Environ 2, the claim would not read on the Hancor reference. Accordingly, TCI argues, the scope of equivalents of claim 7 should not be narrowed to exclude the Environ 2.
 
 
 29
 To be sure, the district court did not explain in detail the reasons underlying its conclusion that the asserted scope of equivalents would encompass the prior art. The examiner, however, cited several prior art references disclosing sumps with riser covers that were equipped with separate lids. Moreover, the prosecution history of the reexamined '509 patent makes clear that claims 7 and 11 were allowed only because the examiner was unaware of any prior art that taught or suggested the use of score lines or cutting guides on the riser section. Under these circumstances, the district court's finding that the use of corrugations as cutting guides was in the prior art is sufficient to sustain the court's determination that TCI's asserted scope of equivalents would encompass the prior art.
 
 
 30
 We also reject TCI's argument that the doctrine of assignor estoppel, which prohibits EPI from challenging the validity of the original '408 and '509 patent claims, bars EPI from seeking to have the scope of equivalents restricted by the prior art. EPI's argument on the doctrine of equivalents issue is that the invention of the original '509 patent, with corrugations substituted for score lines, was in the prior art. That argument does not require EPI to attack the validity of the original '509 patent, which is all that the doctrine of assignor estoppel prohibits. Accordingly, we hold that the district court did not err in finding that the Environ 2 did not infringe claim 7 of the '509 patent under the doctrine of equivalents.
 
 
 31
 With respect to TCI's argument that claim 11 reads on certain of the EPI devices, it is true that the term "cutting guides" in claim 11 encompasses the corrugations in the riser of EPI's products. Claim 11, however, was added on reexamination and therefore applies only to two-piece EPI sump-riser products that were sold after the issuance of the reexamination certificate in September 1994. Those products did not have covers with access lids, and they therefore do not satisfy the limitation of claim 11 that requires a cover "having means for accessing" the interior of the sump.
 
 
 32
 In sum, we reject each of the assertions of error in claim construction that TCI has raised on appeal. We therefore affirm the portion of the judgment from which TCI has taken its appeal.
 
 EPI's Cross-Appeal
 
 33
 On its cross-appeal, EPI challenges (1) the district court's award to TCI of attorneys' fees for its defense against EPI's inequitable conduct charge, (2) the court's determination of 21 percent as a reasonable royalty for the sales of EPI's infringing Environ 1 product, and (3) the district court's ruling that claims 11 and 19 of the '509 patent, which were added in reexamination, are not invalid.
 
 1. Attorneys' fees
 
 34
 The award of partial attorneys' fees arose from EPI's allegation that TCI engaged in inequitable conduct during the reexamination proceedings. EPI alleged that TCI withheld from the PTO evidence of on-sale activity. The district court found EPI's charge meritless on two grounds: (1) that EPI failed to prove its assertions regarding on-sale activity; and (2) in any event, that TCI's counsel submitted the evidence in question to the PTO during the reexamination proceedings and the PTO declined to consider that evidence.
 
 
 35
 EPI argues that its inequitable conduct allegations were based on a reasonable interpretation of the law regarding TCI's obligations to disclose to the PTO, on reexamination, evidence of the prior art and on-sale activity. Even if that is so, it does not help EPI, because the district court found that EPI persisted in its allegation of misconduct by TCI even after it learned that TCI had presented the allegedly withheld information to the PTO, and after the PTO had stated that it would not consider the information in the reexamination proceeding. EPI argues that TCI should have gone further and specifically admitted that on-sale activity rendered the invention unpatentable, rather than merely providing the pertinent information regarding the on-sale bar issue to the PTO for its consideration. We disagree. TCI was not required to draw that ultimate conclusion in order to satisfy any obligation of candor it may have had to the PTO. Providing the evidence from which the PTO could draw its own conclusion, if it chose to do so, fully acquitted any disclosure obligations TCI may have had. Because we conclude that the district court's findings with respect to the parties' conduct in the reexamination proceedings are not clearly erroneous, we hold that the district court did not abuse its discretion in finding this case to be exceptional in one respect and awarding partial attorneys' fees to TCI.
 
 2. Reasonable royalty
 
 36
 We cannot agree, however, with the "reasonable royalty" determination that the district court made in assessing damages for EPI's sales of its infringing Environ 1 product. To determine a reasonable royalty, the district court relied on a hypothetical arm's length negotiation as of the date infringement began. Starting with one-fourth of EPI's profits (8.75 percent), the district court added 2 percent to recapture TCI's lost profit on sales of accessories. The court then added "about 10%" to the royalty to arrive at the final 21 percent figure. The court based the addition of the 10 percent on two factors. First, the court stated that EPI was in a poor bargaining position after the '408 patent issued because EPI needed time to redesign its infringing product but had to continue selling sumps to remain in business. In addition, the court concluded that because TCI and EPI are direct competitors, TCI could have demanded and received a very high royalty, or it could have refused to grant a license regardless of the royalty offered.
 
 
 37
 The factors that the district court cited to justify adding 10 percent to the royalty calculation lack sufficient evidentiary support. Although the selection of a reasonable royalty necessarily involves an element of approximation and uncertainty, the amount selected must have factual support in the record. See Unisplay, S.A. v. American Elec. Sign Co., 69 F.3d 512, 517, 36 USPQ2d 1540, 1544 (Fed.Cir.1995). With respect to the first factor, the district court noted elsewhere in its opinion that EPI started selling its noninfringing Environ 2 in June 1992, roughly a month after the court granted a preliminary injunction against the Environ 1 in May 1992. As the court found, EPI produced the Environ 2 by simply machining off the annular lip on the Environ 1 sump base. Absent a finding that machining off the annular lip involved the expenditure of substantial time and effort, we question the court's reliance on the time that EPI allegedly needed to "redesign" its infringing product.
 
 
 38
 With respect to the second factor, the district court noted that TCI and EPI operate in a "highly lucrative and competitive market," with expected revenues of about $69 billion in the 30-year period from 1988 to 2018. Nevertheless, without discussing other market players or competing alternative technologies, the court found that TCI might have refused to grant EPI a license "regardless of the royalty offered." In a competitive industry, when faced with an unreasonably high license fee for patented technology, the market players ordinarily opt for noninfringing alternatives. See State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1581, 12 USPQ2d 1026, 1031-32 (Fed.Cir.1989). Moreover, in the portion of its opinion rejecting TCI's claim for lost profits, the court found that TCI had failed to prove the absence of alternative non-infringing products. Without a proper evidentiary basis for its conclusion that TCI was in a strong bargaining position, the court's second assumption cannot stand. Because the 21 percent royalty figure lacks adequate evidentiary support, we vacate the damages award and remand for redetermination of a reasonable royalty.
 
 1 Claims added on reexamination
 
 39
 EPI argued to the district court and has raised on cross-appeal the contention that claims 11 and 19 of the '509 patent, which were added on reexamination, broadened the original '509 patent in violation of 35 U.S.C. § 305, which governs the conduct of reexaminations by the PTO. Section 305 states that "[n]o proposed or amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding." In its reply brief, however, EPI has advised us that it is not necessary for us to address this issue if we uphold the district court's construction of the "having means for accessing the interior" clause of the '509 patent claims. We have upheld the district court's construction of that clause. Treating EPI's section 305 argument as a conditional cross-appeal, we decline to address the issue.
 
 
 40
 AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED.