NEWMAN, Circuit Judge,
concurring in part, dissenting in part.
I join the court’s opinion with the exception of Part III, damages. On the question of damages, my colleagues on this panel have departed from the guidance and the requirements of precedent, distorting the principles of this court’s decisions, including such recent rulings as Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301 (Fed.Cir.2009), and i4i Limited Partnership v. Microsoft Corp., 589 F.3d 1246 (Fed.Cir.2009). My colleagues on this panel hold that it is improper to consider, for the purpose of understanding the value of the infringed patents, any licenses involving the technology of those patents bundled with additional technologies, such as software code. Thus the court holds that it was legal error to take cognizance of most of the existing licenses introduced at trial. The reasoned consideration by the district court is ignored, and the evidence is misconstrued. This is not a case of constructing, and applying, a royalty rate from totally unrelated content; it is simply a case of determining the evidentiary value of the infringed subject matter by looking at the various licenses involving that subject matter, and allocating their proportional value, with the assistance of undisputed expert testimony. From my colleagues’ misperception of this process, I respectfully dissent from Part III of the court’s opinion.
I
In the district court, ResQNet’s damages expert Dr. David, a qualified economist with experience in the field, followed the traditional application of the Georgia-Pacific factors, see Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp. 1116 (S.D.N.Y.1970), analyzing the impact of all of these factors in an extensive Expert Report and in testimony at trial. He was subject to examination and cross-examination in the district court, and the district court provided a full and reasoned analysis of the evidence. No flaw in this reasoning has been assigned by my colleagues, who, instead, create a new rule whereby no licenses involving the patented technology can be considered, in determining the value of the infringement, if the patents themselves are not directly licensed or if the licenses include subject matter in addition to that which was infringed by the defendant here. In this case, the added subject matter was usually the software code that implements the patented method, as the district court recognized, and whose contribution to the value of the license was evaluated by the dam *877 ages expert and discussed by the court. My colleagues’ ruling today that none of that information is relevant to the assessment of damages is unprecedented, and incorrect.
The evidence at trial fully explored the licenses granted by ResQNet for its technology. Dr. David’s Expert Report addressed all seven of these license agree-, ments, explaining what they cover and how they relate to the infringement herein. Two of the licenses had been entered in the settlement of litigation, and the others included not only the patented technology but some additional subject matter, generally the software code for use with the patented system. These are the “bundled” licenses that my colleagues exclude in their entirety, apparently equating them with discredited verdicts in unrelated cases on different facts, that were based upon a royalty base that included the value of unpatented and unrelated subject matter. That is not here the case. To the contrary, the district court here recognized the differences between these licenses and the analysis at hand, and took those differences into account.
The district court also took into account the licensing practices and royalty rates in this industry, in determining a fair royalty for the specific infringement by Lansa. Dr. David explained that the 12.5% royalty was in the conventional range of one fourth to one third of the licensee’s profit from use of the patented technology. He explained that this rate was significantly lower than the royalties in the bundled licenses, and higher than the royalty in one of the litigation settlements. All of these agreements were analyzed at trial, and their application explained, as the district court applied the principles of the hypothetical negotiation. The district court, discussing the expert’s Report and testimony, stated:
None of the licenses considered by Dr. David is a perfect approximation of the hypothetical license between ResQNet and Lansa. The licensing agreements ResQNet reached with IBM, Hummingbird, Crystal Point, ICOM, and Ericom between 1998 and 2002 each involved licensing of ResQNet’s software or code, and each involved rates higher (some substantially so) than 12.5%. ResQNet’s only two straight patent licenses, one of which was lower than 12.5%, were granted in the shadow of litigation, and without the assured validity of the '075 Patent. Dr. David’s conclusion that the reasonable rate lies between these two categories’ averages (and closer to the lower one) is well-reasoned and supported in the record. In fact, by omitting the upfront payments present in the majority of ResQNet licenses, Dr. David’s methodology is actually biased in favor of lowering the estimated reasonable royalty.
ResQNet.com, Inc. v. Lansa, Inc., 533 F.Supp.2d 397, 417-18 (S.D.N.Y.2008) (citations omitted). My colleagues on this panel assign no error to this solid reasoning; they simply ignore it, stating that “[t]he re-bundling licenses simply have no place in this ease.” Maj. Op. at 871. Neither Lucent nor any other precedent dictates such a blanket exclusion of relevant evidence. The correct approach is that which was followed by the district court.
In testimony, Dr. David explained the higher rates for the bundled licenses, and explained why these rates should not be applied to Lansa’s infringement. However, he did not ignore these licenses, instead explaining why all of the licenses are properly considered:
ResQNet does, of course, provide code; they don’t just provide the patent or rights to use the patent. And so clearly *878 there should be a recognition that you’re getting more for your money there in a rebranding or bundling arrangement than you are in a straight patent license.
On the other hand, the two straight patent licenses that we do have were reached in the course of litigation when the patents were clearly being challenged. So the right number ought to be somewhere in the middle.
JA2264-65. In his Expert Report, Dr. David tied the bundling licenses to the patented technology. He explained that “ResQNet’s products are known as ‘terminal emulation’ software and are based on the technology described in the patents in suit.” The report also states that the bundling licenses are directed to ResQNet’s software products, as well as code for the terminal emulation technology. This evidence was unrebutted. My colleagues now hold that no attention at all can be given to the bundled licenses, or the relation of their content to the patented technology, for my colleagues conclude without explanation that the licenses have “no relation to the claimed invention.” Maj. Op. at 870. My colleagues hold that it is reversible error, as a matter of law, to have considered these licenses at all. In the heavily fact-driven obligation of the district court with respect to assessment of damages, this is clearly incorrect. Further, Lansa did not dispute the evidence and testimony provided by ResQNet.[1]
The district court discussed all seven existing licenses. Two of these agreements were in settlement of litigation. One of these settlement licenses, between ResQNet and Seagull Software Systems, Inc., included a lump sum amount and equity participation. The panel majority holds that the rates in the bundling licenses are “not consistent at all” with the Seagull license. Maj. Op. at 870. This is speculation, for ResQNet’s damages expert was not able to analogize the lump sum amount to a royalty rate due to the absence of additional financial information pertinent to the value of the settlement transaction. Indeed, this court observed in Lucent, 580 F.3d at 1330, that “fundamental differences exist between lump-sum agreements and running-royalty agreements” — not for the purpose of excluding such evidence, but to point out that such differences must be recognized. The Seagull license is relevant, for the lump sum amount therein is substantially greater than the amount that was here awarded to ResQNet.
The other settlement license was in settlement of infringement litigation against Zephyr Development Corporation. The existence of this license and its lower rate[2] was a major factor in the district court’s determination that a hypothetical negotiation would produce a royalty significantly lower than the 24% average of ResQNet’s other licenses. The court also was influenced by Lansa’s profit margin in its sale of the infringing products, which supported the traditional rate of one fourth to one third of profits. In considering the settlement licenses, the district court commented that the settlement of ongoing litigation can involve considerations quite different from the “hypothetical negotiation,” which is conducted on the premise that the *879 patent is valid and would be infringed. Thus the district court selected a royalty higher than that in the litigation settlement, although much lower than for any of the licenses that included the software code.
My colleagues, in setting strict barriers as to what evidence can be considered, leave the damages analysis without access to relevant information. However, it is not necessary that the identical situation existed in past transactions, for the trier of fact to determine the value of the injury. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931) (“it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate”); State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573, 1576-77 (Fed.Cir.1989) (“Deciding how much to award as damages is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court.”).
Lansa offered no evidence, no testimony, no witness. The role of the trial is to provide evidence for the trier of fact to consider, weigh, and credit as appropriate. Paper Converting Mach. Co. v. Magna-Graphics Corp., 745 F.2d 11, 22 (Fed.Cir. 1984) (“Determining the weight and credibility of the evidence ... is the special province of the trier of fact.”) (internal quotations omitted). The district court’s endorsement of a royalty of 12.5% was explained as based on the adjudication of validity and infringement, and as a balance of the royalties actually paid for licenses to this technology with software code and the royalties in the litigation settlement, with due consideration to Lansa’s profits on the infringing products. This damages assessment is not analogous to that criticized in Lucent, where the damages award was based on the entire market value of a system in which the infringing component was but a small part. Here, in contrast, the patented technology was a large part of the “bundled” licenses, and these licenses were fairly considered for their content and value.
In addition, my colleagues diverge from the principles of the “hypothetical negotiation,” for the theory of such “negotiation” as a tool in assessing patent damages is that the patent is valid and that a license is needed to avoid infringement. Such a hypothetical negotiation takes into account the profit of the licensee for use of the licensed patent. Lansa testified, through its chief financial officer, that the infringing technology was resold by Lansa at specified profit margins.[3] There was evidence that in this field of commerce the customary royalty is one fourth to one third of the licensee’s profit on the licensed subject matter. See, e.g., i4i Limited Partnership, 589 F.3d at 1268 (referring to “the 25-percent rule ... which assumes the inventor will keep 25% of the profits from any infringing sales”). That evidence conforms with the rate of 12.5% awarded by the district court.
The panel majority thus appears to exclude all evidence except for the royalty in the settlement agreement between ResQNet and Zephyr Development Corporation. The district court observed that licenses entered during litigation are not necessarily comparable to licenses negotiated between a willing licensor and licensee before infringement has begun. The court is not required to pretend that the litigation context was absent, with its burdens, costs, and uncertainties. The case that originated the “hypothetical negotiation” itself cautioned that when a “reason *880 able royalty” is the basis for damages, it is not “the normal, routine royalty non-infringers might have paid.” Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1158 (6th Cir.1978). The courts thus implemented the statutory prescription that patent damages shall be “in no event less than” a reasonable royalty. 35 U.S.C. § 284. It is the minimum, not the maximum. Bandag, Inc. v. Gerrard Tire Co., 704 F.2d 1578, 1583 (Fed.Cir.1983) (a reasonable royalty is “merely the floor below which damages shall not fall”).
The district court observed that in litigation the patent is already at risk. The unpredictability of patent litigation remains notorious. In addition, particular litigation settlements may be based on unique considerations. Lansa itself argues that the royalties of litigation-induced licenses should not be considered, citing Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed.Cir.1983) (“since the offers were made after the infringement had begun and litigation was threatened or probable, their terms should not be considered evidence of an established royalty, since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation”). Lansa itself argues that “negotiations performed in the context of litigation are not reliable as a basis for determining a reasonable royalty,” Corrected Brief in Opposition, at 42, contrary to the position of my colleagues herein.
In contrast to precedent, the panel majority moves the Zephyr agreement to the forefront of the analysis, assuring the infringer, after losing in litigation, of no worse penalty than the lowest royalty previously accepted in settlement. As stated in TWM Manufacturing Co. v. Dura Corp., 789 F.2d 895, 900 (Fed.Cir.1986), such a rule would “make an election to infringe a handy means for competitors to impose a ‘compulsory license’ policy upon every patent owner.” It is also contrary to the protocol of the hypothetical negotiation, which is designed for use when there is no established royalty. See, e.g., Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1353 n. 5 (Fed.Cir.1999) (“The court candidly stated that the 3% rate is its ‘best estimate,’ an honest observation that would apply to most reasonable royalty analyses, given the difficulty of determining a hypothetical agreement between parties which did not actually agree on anything at all.”).
The panel majority states that Lucent requires its ruling. Lucent held that the damages award should relate to the value of the patented technology, not to the entire market value of a system of which the patented technology is a demonstrably small part. In Lucent the damages award was “roughly three to four times the average amount in the lump-sum agreements in evidence,” id. at 1332, grossly unlike the present situation, where the royalty rate is less than the average of all the agreements, related to the patented technology. This case is in marked contrast to the situation in Lucent, where the court stated: “This is not an instance in which the jury chose a damages award somewhere between maximum and minimum lump-sum amounts advocated by opposing parties.” 580 F.3d at 1332. In contrast, the damages award herein was indeed somewhere between the highest and lowest rates of these licenses.
This court in Lucent also made clear that “we do not conclude that the aforementioned license agreements (or other evidence) cannot, as a matter of law, support the damages award in this case.” 580 F.3d at 1335. Today’s revision of the principles of Lucent is not tenable. Indeed, the court in Lucent recognized that “any *881 reasonable royalty analysis ‘necessarily involves an element of approximation and uncertainty.’ ” Id. at 1325 (quoting Unisplay, S.A. v. American Elec. Sign Co., 69 F.3d 512, 517 (Fed.Cir.1995)).
In the thorough analysis of valuation factors that was presented in this case, all of the Georgiar-Pacific factors were explained at trial. My colleagues misdescribe this testimony by stating that Dr. David considered only “a few” of those factors, Maj. Op. at 870, for he discussed all fifteen factors. He explained that two of these factors have an “upward influence” on the royalty rate as applied to this particular case, one has a “downward influence,” and the remaining factors are neutral. He explained that in this case the first factor was most useful, for it relates to other licenses granted by the patentee for the same technology.
On my colleagues’ conclusion that most of the licenses granted by the patentee should not be considered at all, this court then should at least consider the other factors, for all were explored at trial, and all were applied to the extent they were relevant. For example, the second factor states that consideration may be given to royalties paid by the licensee to others. Dr. David described Lansa’s royalty payments to Looksoftware on revenues of the Newlook product, as well as Lansa’s royalty payments to a company called Momentum on another software product. These rates were all significantly higher than the 12.5% that the district court assessed. My colleagues do not mention this evidence, although it is powerful support for the district court’s ruling.
The fourth Georgiar-Pacific factor, concerning the licensor’s policies and practices regarding the grant of licenses to its technology, was also discussed in the district court, for it also weighed on the side of a higher royalty rate. Dr. David explained in his Report that, “except to settle ongoing litigation, ResQNet has not provided straight licenses to its patents. Rather, the company has chosen to license the code for its software products or negotiate distributor agreements for the products themselves.... ” Dr. David also discussed the Georgiar-Pacific factor that accounts for portions of the profit that should be credited to features separate from the patented invention; he stated that, “I assume that ResQNet’s straight licenses for the patents in suit would have a greater influence on the negotiated royalty rate than the other agreements.... Consequently, I conclude that this factor would tend to decrease the negotiated royalty payment below its initial level.”
Also relevant is Dr. David’s consideration of the twelfth Georgia-Pacific factor, directed to the customary profit for use of the invention or analogous inventions. Dr. David testified as to the evidence of Lansa’s profits on the infringing Newlook software and discussed the oft-utilized “25% rule” for damages. He explained that the 12.5% royalty rate met this factor. The other Georgiar-Pacific factors were determined by Dr. David to have a neutral effect. The majority ignores the thoroughness of this analysis, and assigns neither flaw nor error to its conclusions.
In sum, the district court presented a thorough opinion in which the court explained its selection of the 12.5% rate, while acknowledging that “[t]he determination of the outcome of a hypothetical negotiation is by its very nature an imprecise art.” ResQNet, 533 F.Supp.2d at 417. I repeat that Lansa presented no testimony and proffered no evidence. Although Lansa waived the position on which my colleagues rely, this court fills the gap. For example, my colleagues do not discuss the district court’s reasoning, but state that they find “particularly troubling” that *882 some of the licenses in evidence had “extremely high rates [when] compared with the [litigation-induced] license on the claimed technology.” Maj. Op. at 870. The district court fully considered this aspect, and factored it into a competent overall analysis in which no flaw has been shown. The court’s conclusion warrants affirmance.
II
My colleagues do not discuss the separate award by the district court of an ongoing, “compulsory license” to Lansa, at the same rate of 12.5%. ResQNet did not appeal this aspect of the final judgment. Issues with respect to future infringing activity are quite different from those where the infringement occurred in the past. Compulsory future licenses are rare, particularly when the patentee is itself practicing the invention and would thus be judicially placed in market competition with a licensee it did not seek. My colleagues do not state whether the 12.5% rate may continue to apply to future activity or whether an injunction would now be available. In Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1315 (Fed.Cir.2007), this court remanded “for the limited purpose of having the district court reevaluate the ongoing royalty rate.” This court also stated:
In most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty. Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement.
Id. at 1314-15.
CONCLUSION
This court today holds that only the royalty in the settlement agreement can be considered in the hypothetical license negotiation. This ruling, excluding all of the other considerations relevant to determining damages for a patent that has been held valid and infringed, is contrary to all precedent. I respectfully dissent.

. Lansa apparently argued to the district court that an "IBM bundled software” agreement was relevant, but, as the district court found, Lansa "has not cited any part of the record to support its contention that that license is analogous, or even that [its licensing rate] was in fact one to three percent.” ResQNet.com, 533 F.Supp.2d at 417. Lansa has not raised this agreement or any other evidence on this appeal.

. The actual rate for this license is subject to a protective order.

. Lansa's specific profit margins are subject to a protective order.