LUCENT TECHNOLOGIES, INC., Plaintiff,

v.

MICROSOFT CORPORATION, Defendant.

Case No. 07–CV–2000 H(CAB).

United States District Court, S.D. California.

Nov. 10, 2011.

David A. Hahn, David A. Hahn, Attorney at Law, Coronado, CA, Edward C. Donovan, Gregory F. Corbett, Karen Michelle Robinson, Kirkland & Ellis LLP, Washington, DC, Elizabeth T. Bernard, James E. Marina, Jeanne M. Heffernan, Michael Lavine, Robert A. Appleby, Ryan Kane, Kirkland & Ellis LLP, New York,

NY, Eric D. Hayes, Kirkland & Ellis LLP, Chicago, IL, Kenneth Howard Bridges, Bridges & Mavrakakis LLP, Palo Alto, CA, Luke L. Dauchot, Kirkland & Ellis LLP, Los Angeles, CA, for Plaintiff.

Francis Albert, Craig E. Countryman, Juanita R. Brooks, Michael M. Rosen, Roger A. Denning, Fish & Richardson P.C., San Diego, CA, Michael E. Florey, Fish & Richardson P.C., Minneapolis, MN, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART MICROSOFT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND IN THE ALTERNATIVE, A NEW TRIAL WITH A REMITTITUR

MARILYN L. HUFF, District Judge.

This case is on remand from the Federal Circuit for a new trial on damages for Microsoft's infringement of claims 19 and 21 of U.S. Patent Number 4,763,356 ("Day patent"). *See Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301 (Fed.Cir. 2009). The first jury returned a finding of infringement and validity of the Day patent, and Microsoft appealed the verdict and damages award. *See id.* The Federal Circuit affirmed the jury's verdict on the infringement and validity of the Day patent, but remanded the case for a new trial on damages. *Id.*

On July 29, 2011, the jury returned a verdict of $70 million as the lump-sum reasonable royalty for Microsoft's infringement of the Day patent for Microsoft Outlook (versions 2000, 2002, and 2003); Microsoft Money (versions 2000 through 2006); and Windows Mobile (versions Pocket PC 2000, 2002, and 2003, Windows Mobile 2003, and Windows Mobile 5). (Doc. No. 1383.) On July 29, 2011, this Court issued judgment in favor of Lucent against Microsoft in the amount of $70 million. (Doc. No. 1387.)

On August 26, 2011, Microsoft filed a motion for a new trial (Doc. No. 1434) and a post-trial motion for judgment as a matter of law (Doc. No. 1433).[1] On September 27, 2011, Lucent filed a response in opposition to Microsoft's motion for a new trial and post-trial motion for judgment as a matter of law. (Doc. Nos. 1451 & 1454.) On October 4, 2011, Microsoft filed its reply. (Doc. Nos. 1457 & 1458.)

On October 12, 2011, the Court held a hearing on these post-trial motions. Luke Dauchot, Jeanne Heffernan, and Ryan Kane appeared for Plaintiff Lucent. Roger Denning, Michael Florey, Francis Albert, and Craig Countryman appeared for Defendant Microsoft. The Court compliments the attorneys and trial counsel for their excellent advocacy in this case.

After due consideration, the Court grants in part and denies in part the motion for judgment as a matter of law and enters judgment of $26.3 million. The Court also conditionally grants in part and denies in part the motion for a new trial under Federal Rule of Civil Procedure 50(c), with a remittitur of $26.3 million.

## I. Background

This case illustrates the difficulty of properly valuing a small patented component, without a stand-alone market, within a larger program. *See Lucent,* 580 F.3d at 1324; *Uniloc U.S.A., Inc. v. Microsoft,* 632 F.3d 1292 (Fed.Cir.2011); *ResQNet.com Inc. v. Lansa, Inc.,* 594 F.3d 860, 869

---

1. During trial, Microsoft filed a motion for judgment as a matter of law at the close of Lucent's case (Doc. No. 1369) and Microsoft filed a motion for judgment as a matter of law at the close of all evidence. (Doc. No. 1377.) During trial, Lucent filed its opposition to these motions. (Doc. Nos. 1371 & 1381.) The Court submitted these motions. (Doc. No. 1422.)

(Fed.Cir.2010); *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).

Microsoft's popular Outlook product infringes claims 19 and 21 of the Day patent. *Lucent*, 580 F.3d at 1321, (PX–1 at 17:27–18:14, 18:19–22.) Specifically, the date-picker permits users to calendar appointments by clicking on a calendar and populating the field with the resulting date. The Day patent's technology is included in 109.3 million Office suite ("Office") licenses and in 241,800 stand-alone Outlook products, for a total of 109.5 million licenses during the relevant period from January 13, 2003 to December 11, 2006.[2] Additionally, Microsoft Money and Windows Mobile infringe the Day patent, but the vast majority of the claimed damages relate to the 109.3 million Office licenses.

In a trial for damages for patent infringement, a prevailing party deserves damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringed." 35 U.S.C. § 284 (2006). The parties dispute whether the jury had a legally sufficient evidentiary basis to award $70 million for the infringement as a lump-sum royalty. Microsoft argues that Lucent failed to provide the jury with a properly-apportioned damages calculation in violation of the entire market value rule. (Doc. Nos. 1434 & 1433.) Lucent responds that it properly apportioned between the patented features and unpatented features under the relevant *Georgia–Pacific* factors without relying on the entire market value rule. *Georgia–Pacific*, 318 F.Supp. at 1120.

To support its claim of damages, Lucent called Bruce Tognazzini, a well-recognized technical expert; Dr. Deborah Jay, a survey expert sought by both sides for her renowned expertise in probability surveys; Raymond Sims, an economic expert; Stephen Samuels, Bruce Schneider, and Roger Stricker, Lucent's licensing witnesses; and adverse witness, William Kennedy, a Microsoft executive. Microsoft strategically elected to put Lucent to its burden of proof. In so doing, Microsoft declined to call its survey expert, a licensing witness, or an economist to evaluate damages. Instead, Microsoft called a professor of negotiation theory, Robert Mnookin, and Microsoft executives William Kennedy and Jensen Harris. The jury, after evaluating the credibility of witnesses, agreed with Lucent and rejected Microsoft's arguments and biased witness testimony in reaching its valuation of $70 million.

## II. Microsoft's Motion for Judgment as a Matter of Law .

### A. Legal Standards for Motion for Judgment as a Matter of Law

■■■ A jury verdict can be overturned and a post-trial motion for judgment as a matter of law granted "only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if 'there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir.2001). In ruling on a motion for judgment as a matter of law, the district court "is not to make credibility determinations or weigh the evidence." *Id.* The district court "must accept the jury's credibility findings consistent with the verdict." *Id.*

■■■ For the motion, the district court must view the evidence in the light most

---

**2.** The Court again rejects Microsoft's challenge under *Global–Tech Appliances, Inc. v. SEB S.A.*, —— U.S. ——, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011), to the notice period as it did not preserve this issue on appeal and on the merits. (*See* Doc. No. 1304.)

favorable to the non-moving party and draw all reasonable evidentiary inferences in favor of the non-moving party. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir.2006). The Court must uphold a jury's verdict even if the record contains evidence that might support a contrary conclusion to the jury's verdict. *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002). The district court must disregard evidence favorable to the moving party that the jury is not required to believe. *Reeves*, 530 U.S. at 150–51, 120 S.Ct. 2097; *Pavao*, 307 F.3d at 918; *Winarto*, 274 F.3d at 1283, 1286–87 (district court must "accept the jury's credibility findings consistent with the verdict" and "disregard all evidence favorable to the moving party that the jury is not required to believe" because "[w]hen two sets of inferences find support in the record, the inferences that support the jury's verdict of course win the day.").

▆▆▆▆ "On post-trial JMOL motions, district court judges must scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Lucent*, 580 F.3d at 1336. Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed.Cir.1995), the damages cannot stand if any part of the calculation leading to it was unsupported or contrary to law. *Uniloc*, 632 F.3d at 1317, 1321. "Beginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.* at 1317. Moreover, when an accused device includes patented and unpatented features, as in this case for the Day patent, "the patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's

damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," or show that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Uniloc*, 632 F.3d 1292, 1318 (citing *Garretson v. Clark*, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884)); *see also Lucent*, 580 F.3d at 1336–37. For minor patent improvements, a patentee cannot justify using the entire market value of an accused product simply by asserting a low enough royalty rate. *Uniloc*, 632 F.3d 1292, 1320. If the plaintiff, as in this case, cannot meet the entire market value rule, the plaintiff must apportion between the patented and unpatented features. *Uniloc*, 632 F.3d at 1318.

### B. Lucent's Damages Calculation

Microsoft challenges the jury's $70 million verdict. (Doc. No. 1434–1 at 1.) Significantly, Microsoft argues that "Lucent presented no evidence, much less substantial evidence, that could have led a reasonable jury to conclude that Microsoft would have lost $67 in revenue for any fraction of the 109 million licenses to Office if Outlook did not include the date-picker." (*Id.*) Specifically, Microsoft argues that Lucent failed to provide the jury with a properly-apportioned damages calculation for Outlook based on reliable expert methodology as required by the Federal Circuit and this Court's previous rulings. (*See* Doc. No. 1323, Court's Motion in Limine Order, at 9–10; *Uniloc*, 632 F.3d 1292.)

Lucent refers to the entire record at trial and the jury's credibility determinations in support of the jury's damage award. Further, Lucent emphasizes that this is a reasonable royalty case based on the outcome of a hypothetical negotiation

for a lump-sum, not a lost profits case. (Doc. No. 1451 at 1.)

A lump-sum license is an "upfront, paid-in-full royalty." *Lucent,* 580 F.3d at 1326. A lump-sum royalty benefits the licensor by raising a substantial amount of money quickly. *Id.* On the other hand, a lump-sum royalty benefits the licensee by allowing it to use the patented technology without any concerns of further expenditure. *Id.* Furthermore, a lump-sum royalty removes the inherent risk of under-reporting the actual usage of the patented technology by the licensee, and eliminates administrative burden of having to monitor usage. *Id.* A lump-sum royalty also eliminates any ability for the licensee to reevaluate the value of the patented technology. The licensee agrees to pay the lump-sum royalty regardless of whether the patented technology is successful or even used. *Id.*

A lump-sum royalty may also create risks. If either party incorrectly forecasts the use of the patented feature, a licensee may end up paying a lump-sum far in excess of what the patented invention is later shown to be worth or a licensor may end up accepting a lump-sum that is far less than what the patented invention is later shown to be worth. *Id.* The licensee may also consider its risk of not including the patented invention in its product under *Georgia–Pacific,* 318 F.Supp. at 1120.

During a hypothetical negotiation for a lump-sum royalty figure, the parties may "consider the expected or estimated usage" of the patented invention. *Lucent,* 580 F.3d at 1327. Generally, a frequently used invention is more valuable and commands a higher lump-sum royalty. *Id.* Conversely, a minimally used feature commands a lower lump-sum payment. The lump-sum analysis does not require the parties to precisely calculate the use of the patented feature, unlike a running royalty license. In a typical running royalty, the license is tied to the use of the patented

feature standing alone or incorporated into other products. In a lump-sum calculation, the parties agree on a fully paid up amount based on "expected or estimated usage." *Id.* at 1327.

Here, Lucent sought a lump-sum royalty based on its *Georgia–Pacific* analysis and the business risk to Microsoft from not including the Day patent technology in its products. Lucent properly points out that its evidentiary burden to show a lump-sum reasonable royalty under *Georgia–Pacific* was to present sufficient evidence regarding the outcome of a hypothetical negotiation based on competing positions about the value of the Day patent technology to Microsoft. (*Id.*)

Lucent's $70 million figure considered an expected financial impact to Microsoft without the Day patent technology in Outlook. (R. Tr. at III–244:13–257:4; IV–5:22–32:19.) It is undisputed that Microsoft sold 109.3 million Outlook licenses within Office during the damages period. (R. Tr. at IV–160:4–8.) Mr. Raymond Sims ("Mr. Sims"), Lucent's economic expert, included the 109.3 million Office licenses in his analysis, along with 241,800 licenses for Outlook sold on a stand-alone basis, for a total of 109.5 million licenses. (*Id.; see also* R. Tr. at IV–15:4–16:12.)

Mr. Sims then multiplied the 109.5 million total Outlook licenses by 3% to obtain the number of license sales Microsoft would potentially lose if the Day patent technology was not included in Outlook. The result is a risk of loss of up to 3.3 million license sales. (R. Tr. at IV–14:16–15:3.) He arrived at the 3% figure using data generated by a survey conducted by Lucent's expert Dr. Deborah Jay ("Dr. Jay"). (R. Tr. at IV–11:20–16:12.) Dr. Jay's survey results showed that 7% of Outlook purchase-decision makers that use the drop-down calendar feature would not have bought Outlook if it lacked the drop-

down calendar. (R. Tr. at II–66:24–67:7, 153:11–19,118:10–119; PX–1012; PX–1616.) Mr. Sims multiplied the 7% by the percentage of all Outlook users who use the drop-down calendar—43%—to arrive at 3%. (R. Tr. at IV–10:6–14:15; Doc. No. 1454–3 at 33–37, 43–46 (RS 11–RS15, RS21–RS24).) Dr. Jay agreed with Mr. Sims' calculation of the 3% figure. (R. Tr. at II–159:7–160:21; Doc. No. 1454–3 at 523 (DJ34).) This evidentiary record supports the conclusion that Microsoft would face a potential loss of 3.3 million licenses at the hypothetical negotiation if Microsoft did not include the Day patent technology in Outlook.

Mr. Sims' next step was to calculate a hypothetical revenue loss associated with selling 3.3 million fewer licenses of Outlook. Mr. Sims testified that Microsoft's average per-unit revenue is $67 from sales of stand-alone Outlook. (R. Tr. at IV–167:23–168:4.) Mr. Sims also testified that Microsoft's average per-unit revenue from sales of Office that includes Outlook is $98.19. (R. Tr. at IV–166:13–167:4.) Based on the testimony of Microsoft's Rule 30(b)(6) witness on the subject, Mr. Sims testified that Microsoft does not attribute revenue received from sales of Office to the individual programs within Office. (R. Tr. at III–186:14–189:10; IV–17:5–18:1.) As a result, Mr. Sims used a $67 stand-alone value of Outlook as a proxy for the value of Outlook sold as part of Office.

Mr. Sims testified that his use of $67 as the value for Outlook sold as part of Office was corroborated by a 2010 Microsoft pricing document. The internal document showed that the difference in retail prices between Office with Outlook ($279.99) and Office without Outlook ($149.99) was $130, roughly the retail price of stand-alone Outlook at that time ($139.99). (PX–1895; R.

Tr. at IV–167:23–169:5, 174:6–175:7, 181:10–182:9.)

Mr. Sims also testified that use of $67 as the value of Outlook within Office was appropriate based on internal Microsoft documents showing that Microsoft Outlook is the most frequently used Office application "by far." (PX–838; R. Tr. at III–218:21–219:23; R. Tr. at IV–163:14–164:15.) Mr. Sims testified that he reviewed internal Microsoft records concerning use of the calendar feature within Outlook and Office. (*Id.*) An internal Microsoft presentation states 83% of respondents use Outlook's calendar to manage their work appointments/events/meetings. In another internal Microsoft survey, Microsoft listed several calendar based tasks as "high-impact," noting that 90% of the respondents used calendar features, 84% set up new appointments or meetings, and 79% forwarded or changed meeting requests. (Doc. No. 1399, PX–838.) Therefore, Mr. Sims multiplied the 3.3 million licenses for Office and Outlook by $67 to arrive at his opinion that Microsoft would have potentially lost $221.4 million in revenue if it did not include the Day patent technology in Outlook. (R. Tr. at IV–16:14–18:1, 167:23–168:13, 172:7–10.) The Court also dismisses Microsoft's claim that only 50% of Office licenses infringe. That testimony came from a biased Microsoft employee that both the jury and the Court reject as not credible.

Mr. Sims next multiplied the $221.4 million by Microsoft's uncontested 76.2% division-wide profit margin and, after performing a similar calculation for Money, discounted the total "expected forgone profit" to 2003 to yield a total of $138.7 million.[3] (R. Tr. at IV–18:3–14, 22:13–28:10.)

---

**3.** The Court finds no legal error in Lucent's calculations for Microsoft Money and Microsoft Mobile/Pocket PC, but these figures are insignificant compared to the Outlook numbers in the damages calculation.

Mr. Sims also performed an analysis of time savings to consumers by using the Day patent technology over other methods in Microsoft's three infringing products. Based on internal Microsoft documents, Mr. Sims testified that Microsoft values the time saved by its consumers. (R. Tr. at IV–33:7–38:9, 40:156–41:8, 53:11–54:2; PX–1000; PX–1048; PX–1889.) Mr. Bruce Tognazzini, Lucent's technical expert, and Mr. Sims testified to the amount of time a person saves when using the Day patent technology compared to other methods. (R. Tr. at IV–42:2–17, 54:7–55:8; I–197:20–200:20.) Based on internal Microsoft documents, Mr. Sims determined the number of events over the life of a product where a user can save time by using the infringing technology to schedule appointments. (R. Tr. at IV–44:3–47:2, 48:23–49:6; Doc. No. 1451–4 at 543–547 (RS34–RS37, RS40); PX–829.) Mr. Sims monetized the time by using $12.09, the average per-hour wage in 1996 for workers at the time of the hypothetical negotiation. (R. Tr. at IV–48:2–49:19.) Finally, Mr. Sims testified that he took the number of licenses sold during the infringement period and reduced the number of licenses to account for the users of the Day patent technology. (*Id.*) Mr. Sims performed the same analysis for Money and Pocket PC, discounted the total amount to 2003, and concluded that the time savings value to the consumer is $170 million. (R. Tr. at IV–49:25–53:10.)

Mr. Sims next opined on the outcome of the *Georgia–Pacific* hypothetical negotiation. This hypothetical negotiation tries to recreate the "ex ante licensing negotiation scenario"—"[i]n other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme." *Lucent,* 580 F.3d at 1324–25. In evaluating the hypothetical negotiation, the parties often apply the *Georgia–Pacific* framework.

The fifteen *Georgia–Pacific* factors include: (1) established royalty rate for the patent; (2) license rates paid for comparable patents; (3) type of license (exclusive/non-exclusive or restricted/non-restricted); (4) licensor's established licensing policies; (5) competitive relationship between licensor and licensee; (6) convoyed sales; (7) duration and terms of the license; (8) commercial success and established profitability; (9) advantages over old methods; (10) nature of patented invention and benefits to those that use it; (11) extent of use of the patent by the infringer; (12) customary industry rate for invention or analogous inventions; (13) portion of profit that should be credited to the invention as distinguished from nonpatented elements, manufacturing process, business risks, or significant features added by the infringer; (14) opinion testimony of qualified experts; and (15) amount that licensor and licensee would have agreed upon. *Georgia–Pacific,* 318 F.Supp. at 1120. In *Uniloc,* the Federal Circuit explicitly "sanction[s] the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry." 632 F.3d at 1317. "Those factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue." *Id.* Mr. Sims' testimony concerning the applicable *Georgia–Pacific* factors was proper as was the Court's instruction to the jury on the factors.

Mr. Sims reviewed the survey results, expected foregone profits, value of time savings to consumers, documents reflecting the qualitative value of the patented technology, Lucent's licensing policy, and the parties' respective bargaining positions. He concluded that, during the hypothetical negotiation, Microsoft and Lucent would choose a lump-sum license payment closer to $138.7 million than to zero based on the applicable *Georgia–Pa-*

*cific* factors. (R. Tr. at IV–91:2–13; *see also* R. Tr. at IV–90:19–91:13, 94:11–19.)

Mr. Sims also examined the hypothetical negotiation using a business realities approach.[4] This approach takes into account the parties' various interests and alternatives to reaching an agreement. Mr. Sims testified that Microsoft would consider that it would be at risk for potentially losing $138.7 million dollars if it did not reach an agreement with Lucent. (R. Tr. at IV–91:17–95:24.) Microsoft's competitor to Outlook, Lotus Notes, included the Day patent technology. (R. Tr. at III–250:10–13.) He also testified that while Microsoft would attempt to pay the lowest amount it could for a license to the Day patent, Lucent would seek a royalty as close to $138.7 million as possible to preserve the value of its intellectual property portfolio. (*Id.*) Based on his apportionment, the *Georgia–Pacific* factors, and business realities, Mr. Sims testified that a conservative lump-sum royalty would be $70 million. (R. Tr. at IV–95:5–96:6, 94:13–16.) The jury agreed. The issue is whether the jury's verdict is supported by legally sufficient substantial evidence. *Winarto*, 274 F.3d at 1283.

### C. The Court Advised Lucent that it Needed to Properly Apportion the Value of the Day Patent

The Court next evaluates whether the trial record supports a legally sufficient basis of apportionment between the patented and unpatented features of the Day patented technology within Outlook and Office as required by the Federal Circuit and this Court's previous rulings. (*See* Doc. No. 1323, Court's Motion in Limine Order, at 9–10; *Uniloc*, 632 F.3d 1292.)

 Lucent is entitled to a reasonable royalty for Microsoft's infringement of the Day patent. *See Lucent*, 580 F.3d at 1324; *see also* 35 U.S.C. § 284 (2006). A reasonable royalty is the "floor below which damages shall not fall." *Lucent*, 580 F.3d at 1324. The amount of damages based on a reasonable royalty is an issue of fact for the jury. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir.2003). A jury's award is entitled to deference. *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed.Cir.2004). In damages cases, courts should resolve "any doubts about the amount . . . against the infringer." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed.Cir.2006). In measuring damages, Lucent conceded that it cannot show that the Day patent technology—the date-picker—is the basis for consumer demand of Outlook or Office. Therefore, Lucent cannot meet the entire market value rule. *Uniloc*, 632 F.3d at 1318.

 "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts,'" *Uniloc*, 632 F.3d at 1318 (citing *Lucent*, 580 F.3d at 1336; *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549–50 (Fed.Cir.1995)), or where

---

**4.** Mr. Sims' business realities approach is somewhat similar to Microsoft's expert Professor Mnookin's testimony concerning the interests of the parties in a hypothetical negotiation but with different conclusions. Professor Mnookin referred to one of the parties' interests as a BATNA, the best alternative to a negotiated agreement and a reservation price. Professor Mnookin acknowledged that the parties will come to an agreement if there is overlap in the zone of potential agreement. Microsoft acknowledged that Professor Mnookin's methodology is based on well-established negotiation theories that are widely accepted. (Doc. No. 1257 at 6.) The jury soundly rejected Professor Mnookin's conclusions—not his methodology about negotiations—because there was no credible evidence to support Microsoft's licensing value of $2 to $5 million.

the patented feature was of "such paramount importance that it substantially created the value of the component parts." *Rite–Hite*, 56 F.3d at 1549. Application of the entire market value rule requires adequate proof of three conditions: "(1) the infringing components must be the basis for customer demand for the entire machine including the parts beyond the claimed invention, *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1552 (Fed.Cir. 1997); (2) the individual infringing and non-infringing components must be sold together so that they constitute a functional unit or are parts of a complete machine or single assembly of parts, *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 23 (Fed.Cir.1984); and (3) the individual infringing and non-infringing components must be analogous to a single functioning unit, *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1485 (Fed.Cir. 1990)." *Cornell Univ. v. Hewlett–Packard Co.*, 609 F.Supp.2d 279, 286–87 (N.D.N.Y. 2009) (Rader, C.J., by designation).[5] It is not enough that the infringing and non-infringing parts are sold together for mere business advantage. *See Rite–Hite*, 56 F.3d at 1549–50. Instead, Lucent argues that its analysis apportions the value of the Day patent within Outlook between the patented and unpatented features as required by *Uniloc*.

In *Uniloc*, the Federal Circuit noted the qualifying language in the *Lucent* case that forecloses the entire market value rule because of "the lack of evidence demonstrating the patented method of the Day patent as the basis—or even a substantial basis—of the consumer demand for Outlook.... The only reasonable conclusion supported by the evidence is that the infringing use of the date-picker tool in Out-

look is but a very small component of a much larger software program." *Uniloc*, 632 F.3d at 1319–20; *see Lucent*, 580 F.3d at 1338. If the patentee cannot meet the entire market value rule, then "the patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Uniloc*, 632 F.3d at 1318 (citing *Garretson v. Clark*, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884)).

Lucent conceded that it cannot satisfy the entire market value rule in this case. (R. Tr. at 65:10–21.) As a result, Lucent needed to separate or apportion the defendant's profits and the patentee's damages between the patented and unpatented features. *Uniloc*, 632 F.3d at 1318. The Court concludes that Lucent's initial apportionment of 7% of the purchase-decision makers for Outlook who would not buy Outlook without the drop-down calendar with 43% who use the drop-down calendar sought to apportion between the patented and unpatented features as required by *Uniloc*.[6] (R. Tr. at IV–10:6–14:15; Doc. No. 1454–3 at 33–37, 43–46 (RS 11–RS15, RS21–RS24.)) The jury credited the testimony of Dr. Jay and Mr. Sims over vigorous cross-examination by Microsoft. The Court declines to re-weigh the evidence or make credibility determinations on Lucent's initial apportionment. *Winarto*, 274 F.3d at 1283.

Lucent further apportioned the damages by using a $67 per license figure for all Outlook programs. The Court gave Lucent plenty of notice that it would have to justify its use of the $67 royalty base[7]—or apportionment of its use—in its damages calculation. During three rounds of motions in limine, the Court concluded that

---

**5.** The parties declined the Court's suggestion to instruct the jury on the entire market value rule. (R. Tr., July 18, 2011, at 65:12–21.)

**6.** The Court also rejects Microsoft's argument that Lucent violated the entire market value rule. Rather, Lucent sought to apportion be-

tween the patented and unpatented features in Microsoft's infringing products.

**7.** Both parties round Lucent's base to $67 in their briefs, but in reality, Lucent used $67.39 as the base of Outlook.

Lucent failed to properly apportion between the patented and unpatented features of Outlook in a way that separates out from the royalty base the portion that can be attributed to the Day patent technology. *See Uniloc*, 632 F.3d at 1318. In particular, the Court pointed out:

> Though Lucent discounts the base to include only the revenue from Outlook where a user uses the Day patent technology, Lucent fails to show that it is entitled to capture this entire market value as the base. Specifically, Lucent has not shown that the Day patent technology is the basis for consumer demand for most Outlook users. At best, Lucent has introduced evidence to show that the Day patent technology is the basis for consumer demand for about 7% of users based on the Jay survey.

(Doc. No. 1284 at 12–13.) The Court explained its rationale for a further apportionment: "[f]or a product that is feature-rich like Outlook, use as a proxy for value does not appropriately account for all the other unpatented features that consumers use besides the Day patent technology even when consumers invoke the Day patent methods." (Doc. No. 1284 at 12–13.) *See IP Innovation LLC v. Red Hat, Inc.*, 705 F.Supp.2d 687, 689–90 (E.D.Tex.2010). Pretrial, the Court questioned Lucent's use of $67 as a proper base: "[p]ut into concrete terms, if a sample user uses the infringing Day patent technology but also uses many other features in Outlook, Lucent has not shown that it is entitled to include in the royalty base all $67 of revenue generated from this sample user." (Doc. No. 1284 at 12–13.)

The Court included a diagram to illustrate the need for a further apportionment:

(Doc. No. 1284 at 13.) The Federal Circuit also noted that the Day patent is a minor feature within Outlook. *Lucent*, 580 F.3d at 1331. Because "the patentee ... must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," the Court warned Lucent before trial that its expert failed to properly apportion the Day patent technology as one feature within many features of Outlook and within Office.[8] *Uniloc*, 632 F.3d

8. The Federal Circuit decided *Uniloc* at the time of the Court's initial *Daubert* evidentiary

1292, 1318.

### D. Lucent's Evidence of its Valuation of Outlook within Office is Not Supported by Substantial Evidence

The Court turns to Lucent's specific evidence of apportionment of the $67 for Outlook. Despite the Court's pretrial admonitions, Mr. Sims concluded at trial that the average revenue for Outlook during the relevant time period was $67, whether sold as part of Office or as a stand-alone product. (R. Tr. at IV–14:16–21:10; 159:9–160:8; 161:22–162:5; 167:23–169:16; 174:6–17; 181:10–182:9; Ex. N, PX 1895; Ex. L, RS16–RS20.) The majority of the damages for the 109.5 million licenses are for Office versus the 241,800 stand-alone Outlook sales.

In *Uniloc,* the Federal Circuit additionally held that for minor patent improvements, a patentee cannot justify using the entire market value of an accused product simply by asserting a low enough royalty rate. *Uniloc,* 632 F.3d at 1320; *see also Mirror Worlds, LLC v. Apple, Inc.,* 784 F.Supp.2d 703, 724 (E.D.Tex.2011). Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay,* 69 F.3d at 517, the Court must ensure that the jury verdict is supported by sufficient evidence.

Microsoft contends that Lucent introduced no competent evidence to support application of the $67 stand-alone Outlook revenue to the lost sales of Outlook licenses within Office.[9] (Doc. No. 1434–1 at 9–11.) Specifically, Microsoft argues that applying the stand-alone revenue figure to Office licenses improperly apportions the revenue associated with Outlook when included in Office. The bundled Office price offers a significant discount over purchasing the component software individually. (*Id.*) Lucent's expert, Mr. Sims, relied on the evidence available from internal Microsoft documents [10] and Microsoft component prices as a proxy for the value of Outlook when sold as part of Office. (Doc. No. 1451 at 14.)

For example, Rodney Jenkins, Microsoft's profit and loss controller, testified at trial that Microsoft did not attribute Office revenue to individual programs found within Office. (R. Tr. at III–186:14–189:10; R. Tr. at IV–17:5–18:1.) Nevertheless, an internal Microsoft document indicates that Outlook is the most popular of the Office components (*see* Doc. No. 1399, PX838 at 39) and other internal Microsoft documents demonstrate that use of calendar features in Outlook ranks among the top–10 rated tasks. (*Id.* at 41). The jury agreed with the evidence of Outlook's value within Office and rejected the biased testimony of Microsoft witnesses who at-

---

hearing of Lucent's economic expert. In response, the Court permitted the parties to supplement and revise their expert reports. (Doc. Nos. 1194 & 1284.)

**9.** Microsoft agrees that Mr. Sims accurately calculated the average per-unit revenue for stand-alone Outlook using Microsoft's internal financial documents. (R. Tr. at IV–17:5–18:1; 161:22–162:5.)

**10.** Microsoft did not turn over these documents during discovery before the 2008 trial, even though the documents were responsive to broad discovery requests. The documents

included consumer studies regarding the Day patent. (Doc. No. 1246, Court's Order.) Lucent became aware of the existence of the consumer studies involving the Day patent when William Kennedy testified for Microsoft during the 2008 trial that Microsoft gathered information about how its customers use Outlook through focus groups, consumer feedback, and usability tests. (Doc. No. 119 at 15.) The Court denied Lucent's motion for sanctions for Microsoft's earlier non-production of records. (Doc. No. 1246.) During discovery for the new trial, Lucent's specific discovery requests led Microsoft to produce the documents.

tempted to contradict the internal Microsoft documents. As a result, Lucent contends that Mr. Sims presented the best evidence of value of Outlook within Office for purposes of the hypothetical negotiation. (Doc. No. 1451 at 14.) Lucent also cites to other portions of the trial record to support its substantial evidence position. (R. Tr. at IV–14:16–21:10, 159:9–160:8, 161:22–162:5, 167:23–169:16, 174:6–17, 181:10–182:9; Ex. H; PX 1895; Ex. G, RS 17.)

At the same time, Mr. Sims estimated that the average revenue attributable to Office was $98.19. (R. Tr. at IV–166:13–167:4.) Lucent's calculation using a $67 revenue figure assumes that Outlook represents 68% of the revenue of Office. If so, the collective value of Word, Excel, and PowerPoint represents only $31 for these popular programs. A current version of Office including Word, Excel, PowerPoint, and Outlook retails for $279.95, but each individual component retails for $139.95 as a stand-alone product.[11] (Doc. No. 1434, Ex. E at 70, 92–93.) Added together, the stand-alone components retail for well over twice the bundled price, but Mr. Sims applied a $67 revenue figure to Outlook as a component of Office. The Court concludes that Lucent's attribution of $31 collectively to Microsoft Word, PowerPoint, and Excel is not based on sound economic or factual predicates.

For a proper calculation of patent damages, the Federal Circuit requires "sound economic and factual predicates." *See Riles v. Shell Exploration and Prod. Co.,* 298 F.3d 1302, 1311 (Fed.Cir.2002); *see also Grain Processing Corp. v. American Maize–Products Co.,* 185 F.3d 1341, 1350 (Fed.Cir.1999) ("To prevent the hypothetical from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."); *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.,* 246 F.3d 1336, 1355 (Fed.Cir.2001) ("Such market reconstruction, though hypothetical, requires 'sound economic proof of the nature of the market.' ").

Mr. Sims attempts to justify the $67 value by comparing the sales price of a version of Office with Outlook ($279.99) to a version of Office without Outlook ($149.99). (R. Tr. at IV–167:23–169:5; 174:6–17; 181:10–182:9; Ex. N, PX–1895.) Lucent argues that the difference of $130 dollars, a number close to the $139.99 retail price of Outlook sold on its own, demonstrates that Microsoft values Outlook at $130. (Doc. No. 1451, Ex. N, PX–1895.) In other words, because the price difference ($130) is approximately the price of stand-alone Outlook ($139), Lucent argues that Microsoft values Outlook within Office at the same price ($67) that it values stand-alone Outlook ($67). The Court recognizes that there is some evidence in the record to support Lucent's position. But the version of Office without Outlook that Mr. Sims references was directed at the academic market. (R. Tr. at V–40, 1–25.) The Home and Student version was not sold until the end of the damages period in late 2006. (Doc. No. 1451, Ex. N, PX–1895.) Therefore, Mr. Sims' reliance on the sales price of the Home and Student version without Outlook does not provide substantial evidence that Outlook is worth $67 within Office.

Microsoft, on the other hand, suggested to the jury through attorney argument that $13.45 is the correct amount to attribute to Outlook when it is sold as part of Office. (Doc. No. 1434–1 at 10.) Based on

11. The Court excludes OneNote as inapplicable for the damages period between 2003 to 2006.

Microsoft's contention that $13.45 is a reasonable base for Outlook sales, Outlook would account for 13.7% of the $98 of revenue per unit of Office. (Doc. No. 1434, Ex. D at 172–73, 175.) The Court, and the jury, disagree with this apportionment as well. Internal Microsoft documents demonstrate that Outlook is the most popular Office component. (*See* Doc. No. 1399, PX–838 at 39). Microsoft's internal documents also demonstrate that 84% of Outlook 2007 users set up new appointments or meetings and 90% use calendar features. (*Id.*) Further, Microsoft's internal consumer feedback surveys demonstrate that use of calendar features in Outlook ranks among the top–10 rated tasks. (*Id.* at 41.) Internal Microsoft documents also list "Calendar & Meetings Base menu" as a strength of Outlook. (*Id.* at 47.) Further, internal Microsoft documents state that "Outlook is the most frequently used Office application by far, with nearly all [purchasers] using it at least several times a week. By contrast, PowerPoint is the least used Office application." (*Id.* at 53; Ex. I, PX–838.) The Court concludes that Microsoft's $13.45 apportionment to Outlook within Office is not supported by substantial evidence. Similarly unavailing is Microsoft's assertion that Outlook accounts for only 13.7% of the $98 of revenue per unit of Office. In fact, the Court finds it telling that Microsoft never sold Office without Outlook between almost all of 2003–2006. (R. Tr. at V–39, 11–23.) It was not until late 2006 that Microsoft first launched a Home and Student version of Office, directed at the academic market, that did not include Outlook. (R. Tr. at V–40, 1–25.) The evidentiary record demonstrates that Outlook is worth more than Microsoft's suggested apportionment of 13.7%.

Moreover, the district court must view the evidence in the light most favorable to the non-moving party and draw all reasonable evidentiary inferences in favor of the non-moving party. *Reeves,* 530 U.S. 133 at 150, 120 S.Ct. 2097. The jury chose to reject the testimony from biased Microsoft executives regarding the interpretation of the internal Microsoft documents, and the Court agrees that the Microsoft executive witnesses were discredited.

On post-trial motions, the district court must "scrutinize the evidence carefully to ensure that the 'substantial evidence' standard is satisfied." *Lucent,* 580 F.3d at 1336 (quoting *Unisplay,* 69 F.3d at 517). Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay,* 69 F.3d at 517, it is the court's duty "to ensure that estimates are tied to . . . proper economic methodologies, not just numbers in an accounting format." *Cornell,* 609 F.Supp.2d at 290. The Court concludes that no reasonable jury could conclude that Outlook within Office is worth $67, leaving the value of Word, Excel, and PowerPoint combined to be only $31. (R. Tr. at IV–159:6–160:22.) As a result, the Court concludes that the jury's verdict is not supported by substantial evidence, and therefore, damages are excessive.

Microsoft suggests an alternative apportionment of $24.55 based on the four components of Office. The Court agrees with the alternative apportionment. The Court concludes that, when Outlook is sold as part of Office, the highest amount of revenue attributable to Outlook that is supported by substantial evidence is $24.55. The 2010 pricing data for Microsoft products shows that the prices for stand-alone Outlook, Word, Excel, and PowerPoint were each $139.99. (PX–1895.) Thus, the Court concludes that the evidence supports, at most, allocating 25% of the Office revenue to Outlook, representing one-fourth of Office products—Outlook, Word, Excel, and PowerPoint. This allocation yields a per-unit revenue attributable to

Outlook within Office of $24.55 by multiplying the $98.19 per unit revenue of Outlook by 25%.

In response, Lucent cites to an internal Microsoft document that characterizes "Outlook as the most frequently used Office application by far" and PowerPoint as the least frequently used application. (PX–838). But the pricing data for the components of Office was the same, (PX–1895), adding additional justification in the evidentiary record for $24.55 for each component.

At the post-trial motion hearing, Lucent argued that if the Court applied the $24.55 per unit figure for Outlook when sold as part of Office, the Court should enter judgment in the amount of $52.6 million under the maximum recovery doctrine. *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1351 (Fed. Cir.2001); *Unisplay*, 69 F.3d at 519. Lucent contends that Mr. Sims' testimony supports an award of all of Microsoft's expected forgone profits to Lucent. (R. Tr. at IV–9:23–10:5, 91:2–9, 92:1–6, 94:5–19.) The Court disagrees. Any award above $26.3 million would contradict the methodology of Lucent's expert and result in a speculative windfall to Lucent. As a result, the highest damages award supported by substantial evidence results in a lump-sum damages award of $26.3 million.

Therefore, the Court adjusts Lucent's damages calculation to apply only $24.55—not $67—to the 109.3 million Office licenses and otherwise follows Lucent's damages calculation. The Court concludes that $67 is the appropriate per-unit revenue to use for the 241,800 units of stand-alone Outlook that were included in Lucent's damages calculation. The Court determines that a lump-sum reasonable royalty of $26.3 million is the highest damages award

that is supported by substantial evidence, and that this award reflects a proper apportionment as required by law. *See Uniloc*, 632 F.3d at 1318.[12]

### E. Lucent's Survey Evidence

■ Microsoft renews its *Daubert* challenges to the testimony of Lucent's survey expert, Dr. Jay. (Doc. No. 1434–1 at 2.) The Federal Circuit in *Lucent* suggested the use of a consumer survey on remand as a possible source of data for evaluating reasonable royalties. 580 F.3d at 1333–1334 ("Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable. Usage (or similar) data may provide information that the parties would frequently have estimated during the negotiation.... Such data might, depending on the case, come from sales projections based on past sales, consumer surveys, focus group testing, and other sources.").

After remand, both parties conducted a consumer survey. Lucent hired Dr. Jay and questioned 3,387 online survey respondents. Microsoft hired Philip Johnson, questioned 600 people in a public mall, and had its 30(b)(6) witness, William Kennedy, remove Outlook from Office for testing. (R. Tr. at II–147; IV–126; V–63–64, 139.) Microsoft declined on work product grounds to share the results of its survey. And Microsoft's 30(b)(6) witness, discredited on other grounds, disavowed any knowledge of the test results.

Microsoft contends that Dr. Jay's survey employed biased and misleading questions and did not adequately control its results or account for sampling error. (*Id.*) Lu-

---

12. The Court is not persuaded that a further micro-apportionment is warranted to account for the minor nature of the date-picker within Outlook. Lucent's initial apportionment, based on testimony credited by the jury, is substantial evidence to support the $26.3 million award.

cent responds that Dr. Jay explained in detail every question, result, and calculation in her survey. She presented the jury with 68 demonstratives to facilitate their understanding of the survey. She explained the mathematical calculations she performed, the margin of error, and the effect of guessing on the results. She demonstrated that her methodology and results were consistent with internal Microsoft surveys conducted during the ordinary course of business. (Doc. No. 1451 at 5.) Further, the jury heard that Dr. Jay is a top survey expert in probability-based surveys. (R. Tr. at III–60:24–61:18.) In sum, Dr. Jay persuaded the jury that the survey questions were proper and yielded reliable results. (R. Tr. at II–181–182.)

Under *Daubert*, the court is charged with a "gatekeeper function" to ensure expert testimony is both reliable and relevant. Courts have the "responsibility of ensuring that all expert testimony must pertain to 'scientific, technical, or other specialized knowledge.'" *Uniloc*, 632 F.3d at 1315. The court must decide if such testimony is based on a "firm scientific or technical grounding" as required under Federal Rule of Evidence 702. *Id.* Under Rule 702, a witness qualified as an expert by knowledge, skill, experience, training, or education can testify in opinion or otherwise if: (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702.

In addition to reliability and relevancy, "the patentee must sufficiently tie the expert testimony on damages to the facts of the case." *Uniloc*, 632 F.3d at 1315 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). "[O]ne major determinant of whether an expert should be excluded under *Daubert* is whether he has

justified the application of a general theory to the facts of the case." *Id.*

A trial court's decision to admit expert testimony under *Daubert* follows the law of the regional circuit. *Micro Chem.*, 317 F.3d at 1390–91. A trial court has broad discretion in assessing the relevance and reliability of expert testimony. *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir.2002). The requirement of Rule 702(1) "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed.R.Evid. 702, Adv. Comm. Note (2000). The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.2010). "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Id.* (quoting *United States v. Sandoval–Mendoza*, 472 F.3d 645, 654 (9th Cir.2006)). As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. 2786.

The Court concludes that Dr. Jay is highly qualified in probability surveys. Further, a probability survey is a scientific model that is recognized as a reputable method for a survey. (R. Tr. at II–51–60; III–43.) Moreover, Dr. Jay was subject to vigorous cross-examination about her questions, methods, and conclusions. Dr. Jay's survey was drawn from a representa-

tive sample of 3,387 online users. Dr. Jay adequately explained the error rate and correlated it to the data to show that it did not invalidate the survey results. The jury found her reasoning to be persuasive.[13]

The Court observes that Dr. Jay responded to each of Microsoft's challenges, and adequately explained her methodology and reasoning. Dr. Jay had a reasonable explanation for not asking specifically about Office applications since the overwhelming use of Outlook—99.8%—is within Office. Microsoft's contrary percentages, suggested in attorney questioning, do not constitute evidence to challenge the verdict on JMOL. In sum, Dr. Jay met the standards in *Daubert,* and the jury was persuaded by her reasoned opinions. *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Landes Const. Co. v. Royal Bank of Canada,* 833 F.2d 1365, 1372 (9th Cir.1987); *Union Oil Co. of Cal. v. Terrible Herbst, Inc.,* 331 F.3d 735, 743 (9th Cir.2003).

Microsoft claims that it was error for the Court to permit Lucent to question Microsoft witnesses on the survey Microsoft conducted but did not disclose after Microsoft challenged Dr. Jay's survey on cross-examination. Microsoft's criticisms of the Jay survey methodology and results and Kennedy's testimony made relevant and not overly prejudicial the fact that Microsoft conducted its own survey. (R. Tr. at III–34:6–19.) The Court finds no error in its decision to allow Lucent's limited questions about the survey.

### F. The Court Properly Admitted the Time Savings Analysis

■ Microsoft challenges the Court's admission of Lucent's time savings analysis. Microsoft's own documents admitted

without objection showed that it valued the time saved by its consumers. (PX–1000; PX–1048; PX–1889.) Mr. Sims' time savings analysis indicated that consumers would value the Day patent technology at $170 million and explained why that value is important to Microsoft. (R. Tr. at IV–33:7–38:9, 40:16–41:8, 53:11–54:2.) Based on internal Microsoft documents, Mr. Sims testified that Microsoft values the time saved by its consumers. (*Id.; see also* PX–1000; PX–1048; PX–1889.) Mr. Sims testified that some portion of the time savings amount would be paid by Microsoft to Lucent as a royalty. (R. Tr. at IV–40:16–41:8, 53:11–54:2, 87:1–89:7.) Additionally, the Court gave a limiting instruction that the evidence was to show the value to consumers. Courts have considered time savings as a proper basis for calculating damages. *See Grepke v. Gen. Elec. Co.,* 280 F.2d 508, 511–513 (7th Cir. 1960); *Ziggity Sys. Inc. v. Val. Watering Sys.,* 769 F.Supp. 752 (E.D.Pa.1990). Finally, the fact that consumers of Microsoft's Outlook may enjoy a time savings as a result of the Day patent technology is relevant to *Georgia–Pacific* factors 9, 10, and 11, including the advantages of the patented technology. 318 F.Supp. at 1120. As a result, the Court properly admitted the evidence.

### G. Lucent's Licensing Policy Regarding Acer and Locus

■ Microsoft also challenges Mr. Sims' reference to Lucent's licensing policy at trial, as well as the Acer and Locus agreements. The Court concludes that Lucent's licensing policy and the Acer and Locus agreements are relevant to *Georgia–Pacific* factors 4 and 12 and were

---

**13.** In a bench trial, the outcome may have been different. The Court questions whether 7% of Outlook users would not buy Outlook or Office simply because it lacks the datepicker. But the Court is not the trier of fact, and it is not the role of the Court to weigh the evidence or make credibility determinations on a JMOL motion. *Winarto,* 274 F.3d at 1286–87.

properly admitted at trial. (*See also* Doc. No. 1284 at 15–16 (allowing evidence and testimony regarding Lucent's licensing policy and Acer and Locus agreements).)

A district court may only consider license agreements that are "sufficiently comparable to the hypothetical license at issue in suit." *Lucent,* 580 F.3d at 1325; *see also ResQNet,* 594 F.3d at 872. The district court "must consider licenses that are commensurate with what the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *ResQNet,* 594 F.3d at 872. In ruling on motions in limine, the Court permitted Lucent to introduce two licenses, Acer and Locus, covering graphical user interfaces such as the Day patent, and declined to permit use of other licenses. (Doc. No. 1180.)

In order for a license agreement to support a reasonable royalty rate, the license agreement must involve similar technology. *Lucent,* 580 F.3d at 1327. Both agreements were executed about the time of the hypothetical negotiation and include licenses that covered the Day patent. (R. Tr. at IV–67:11–24; 72:24–74:9; PX–1541; PX–1153.) The Court carefully examined whether the cross license structure precluded their admission, and the Federal Circuit's previous criticism of the Acer license. *Lucent,* 580 F.3d at 1331. Lucent called three licensing witnesses and had limited expert testimony concerning the agreements. The record demonstrates Lucent consistently asked for a minimum of 1 % per patent. The Acer and Locus licenses demonstrated Lucent's license structure, industry practice, and Lucent's licensing practices for the hypothetical negotiation. (Doc. No. 1451 at 23–24.) Ultimately, the Court instructed the jury that the licenses had to be comparable in order

for the jury to consider them as examples of Lucent's licensing policy. (Doc. No. 1392, Jury Instructions, No. 25.)

Moreover, Lucent used Acer and Locus, in combination with testimony about its licensing policy, to rebut Microsoft's speculative claims from witnesses William Kennedy and Microsoft expert, Professor Mnookin, that Lucent would take only $2 million to $5 million for the Day patent. (R. Tr. at IV–75:15–77:16.) Lucent introduced evidence at trial that Lucent's negotiators had a policy to follow in licensing negotiations. (R. Tr. at III–180:2–183:19; IV–60:5–65:18.) Specifically, Lucent introduced evidence that Lucent's licensing policy is to receive 1% of the total revenue from the smallest commercially saleable unit of a product practicing one of its patents. (R. Tr. at V–188:5–11, IV–70:10–23, 72:1–12, 74:14–21.) Mr. Sims testified that the smallest commercially saleable unit in this case was Outlook. (*Id.*) Additionally, at trial, Lucent called Lucent's licensing witness Stephen Samüels, a former Lucent employee who worked in Lucent's licensing division for almost 29 years, Bruce Schneider, and Roger Stricker, to confirm Lucent's 1% licensing policy for its intellectual property portfolio. (R. Tr. at III–180:2–183:19; IV–60:5–65:18.)

Further, the Court excluded evidence regarding Microsoft's settlement license, z4, which involved infringing features within Office. (Doc. No. 1180); *z4 Techs., Inc. v. Microsoft Corp.,* 2006 U.S. Dist. LEXIS 58374 (E.D.Tex.2006). In z4, Microsoft's damages expert testified that the patented feature was a small feature worth a small lump-sum royalty of $3 million to $5 million. *z4 Techs.,* 2006 U.S. Dist. LEXIS 58374. Despite Microsoft's assertion that although it valued the technology at $3 million to $5 million, Microsoft settled the case for $225 million after infringement was affirmed. *z4 Techs.,* 2006 U.S. Dist.

LEXIS 58374. Lucent wanted to introduce the z4 Microsoft license to rebut Professor Mnookin's testimony that Microsoft would only pay $2 million to $5 million for the Day patent as a small feature within Office. The Court kept this license out of evidence because the technology was not sufficiently comparable to the Day patent technology even though it was a small feature within Office. (Doc. No. 1180.)

Accordingly, the Court concludes that it was not error under the totality of the record to admit the Acer and Locus licenses to rebut Microsoft's speculative claims that Lucent would take only $2 million to $5 million for the Day patent, and in any event, harmless error. *See, e.g., Mondis Technology, Ltd. v. LG Electronics, Inc.,* Case No. 07-cv-565-TJW-CE Doc. No. 55 at 5, 2011 WL 2417367 (E.D.Tex. June 14, 2011).

### H. JMOL Motion Conclusion

The Court concludes that judgment as a matter of law, and an alternative new trial, is the appropriate remedy. *Tronzo,* 236 F.3d at 1351–52; *Cornell,* 609 F.Supp.2d at 291–92.[14] Accordingly, the Court grants in part Microsoft's motion for judgment as a matter of law that a reasonable jury could not have returned a verdict in excess of $26.3 million based on the evidence of record. The Court otherwise denies Microsoft's motion for judgment as a matter of law.

### III. Microsoft's Motion for a New Trial

 Microsoft also moved for a new trial. A trial court "may grant a new trial only if the jury's verdict is against the clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict." *Pavao,* 307 F.3d at 918. The jury, and not the court, is given the task of weighing conflicting evidence and making credibility determinations. *See Roy v. Volkswagen of Am., Inc.,* 896 F.2d 1174, 1179 (9th Cir. 1990), amended and reh'g en banc denied by 920 F.2d 618 (9th Cir.1990); *see also Landes Const. Co.,* 833 F.2d at 1372 (jury entitled to believe one set of witnesses over others). And, "it is not the courts' place to substitute our evaluations for those of jurors." *Union Oil Co. of Cal.,* 331 F.3d at 743. In evaluating a motion for new trial, the court "need not view the evidence from the perspective most favorable to the prevailing party." *Landes,* 833 F.2d at 1371. Instead, the court should "set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 729 (9th Cir.2007). For the reasons previously stated, the Court conditionally grants in part Microsoft's motion for a new trial.

 The Court also considers a remittitur. "[W]here there is no evidence that passion and prejudice affected the liability finding, remittitur is an appropriate method of reducing an excessive verdict." *Snyder v. Freight, Constr. Gen. Drivers, Warehousemen & Helpers,* 175 F.3d 680, 689 (9th Cir.1999).

In the event that the judgment as a matter of law is vacated or reversed on appeal, the original verdict is not reinstated, and the case is remanded for further proceedings, the Court grants a new trial, subject to Lucent's decision whether to accept a remittitur award of $26.3 million. *Cornell,* 609 F.Supp.2d at 291–92 (granting judgment as a matter of law and entering judgment on a particular amount, but also

---

**14.** At the hearing on the JMOL and motion for new trial, the Court discussed a new trial, but the parties preferred an order granting the motion for judgment as a matter of law and alternatively for a new trial rather than a new trial only.

conditionally granting a new trial in the alternative subject to a remittitur in the same amount). The Court denies the remainder of Microsoft's new trial motion to the extent Microsoft seeks a new trial based on any other ground.

## IV. Conclusion

Based on the foregoing, the Court orders the following:

(1) The Court grants in part Microsoft's motion for judgment as a matter of law and enters judgment of $26.3 million plus interest and costs. The Court denies Microsoft's motion for judgment as a matter of law in all other respects.

(2) In the alternative, the Court conditionally grants in part Microsoft's motion for a new trial, and, in the event of a remand, offers Lucent a remittitur award of $26.3 million plus interest and costs. The Court denies Microsoft's motion for a new trial in all other respects.

(3) The Court previously taxed costs for the 2008 and 2011 trials against Microsoft in the amount of $450,479.68. (Doc. No. 1460.) Because the Court ordered Microsoft to pay $156,646.82 of that amount within 30 days, the Court deducts that amount from the final judgment. The Court incorporates the remaining costs into the final judgment.[15]

(4) The Court previously awarded Lucent pre-judgment interest calculated from January 13, 2003 through December 11, 2006. Applying that calculation to a judgment of $26.3 million yields pre-judgment interest in the amount of $14,401,653.81. The Court incorporates that amount into the final judgment.

Therefore, the Court enters a final judgment in Lucent's favor, inclusive of costs and pre-judgment interest, in the amount of $40,995,486.67.

**IT IS SO ORDERED.**

---

15. Both parties agreed to this deduction from the final judgment. (*See* Doc. No. 1476–3.)